1

2

3

4              UNITED STATES DISTRICT COURT

5              EASTERN DISTRICT OF CALIFORNIA

6

7  JUAN CARLOS ROBLES,                    CASE NO. 1:14-CV-540 AWI JLT

8              Plaintiff

9       v.                               ORDER ON DEFENDANTS' MOTIONS
                                         FOR SUMMARY JUDGMENT
10  AGRESERVES, INC., et al.,

11             Defendants                 (Doc. Nos. 32, 33, 34)

12

13

14       This is an employment discrimination dispute between Plaintiff Juan Carlos Robles

15  ("Robles") and his former employer, Defendant Agreserves, Inc. ("Agreserves"), his former

16  foreman Defendant George Campo ("Campo"),[1] and his former manager Defendant Jay Payne

17  ("Payne").  Robles alleges claims under 42 U.S.C. § 2000e ("Title VII") and California state law,

18  including violations of the California Labor Code, common law intentional torts, common counts,

19  and the Fair Employment and Housing Act (Government Code § 12900 et seq.) ("FEHA").  The

20  three Defendants separately move for summary judgment on all claims alleged against them.  For

21  the reasons that follow, the Defendants' motions will be granted in part and denied in part.

22

23              **SUMMARY JUDGMENT FRAMEWORK**

24       Summary judgment is proper when it is demonstrated that there exists no genuine issue as

25  to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R.

26  ───────────────

27  [1] "Jorge Campos" appears as a defendant on the docket, but Robles's opposition names a "Jorge Campo," Defendants'
    motion identifies a "George Campo," and "George Campo" filed a declaration as a defendant.  See Doc. No. 33-8.
28  Given the papers and the declaration, the Court concludes that "Jorge Campos," "Jorge Campo" and George Campo
    are one in the same.  The Court will follow the declaration and identify this party as "George Campo" and also will
    order the Clerk to correct the docket to reflect that "George Campo," and not "Jorge Campos," is the correct party.

1    Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-

2    Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears

3    the initial burden of informing the court of the basis for its motion and of identifying the portions

4    of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine

5    issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d

6    265 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is

7    "material" if it might affect the outcome of the suit under the governing law.  See Anderson v.

8    Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); United States v. Kapp, 564 F.3d 1103, 1114

9    (9th Cir. 2009).  A dispute is "genuine" as to a material fact if there is sufficient evidence for a

10   reasonable jury to return a verdict for the non-moving party.  Anderson, 477 U.S. at 248;

11   Freecycle Sunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

12          Where the moving party will have the burden of proof on an issue at trial, the movant must

13   affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.

14   Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an

15   issue at trial, the movant may prevail by presenting evidence that negates an essential element of

16   the non-moving party's claim or by merely pointing out that there is an absence of evidence to

17   support an essential element of the non-moving party's claim.  See James River Ins. Co. v. Herbert

18   Schenk, P.C., 523 F.3d 915, 923 (9th Cir. 2008); Soremekun, 509 F.3d at 984.  If a moving party

19   fails to carry its burden of production, then "the non-moving party has no obligation to produce

20   anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan

21   Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If the moving party

22   meets its initial burden, the burden then shifts to the opposing party to establish that a genuine

23   issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio

24   Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103.  The opposing party cannot "'rest

25   upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets

26   forth specific facts showing that there is a genuine issue for trial.'"  Estate of Tucker v. Interscope

27   Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

28          The opposing party's evidence is to be believed, and all justifiable inferences that may be

                                                   2

1  drawn from the facts placed before the court must be drawn in favor of the opposing party.  See

2  Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Narayan v. EGL, Inc., 616 F.3d 895, 899

3  (9th Cir. 2010).  While a "justifiable inference" need not be the most likely or the most persuasive

4  inference, a "justifiable inference" must still be rational or reasonable.  See Narayan, 616 F.3d at

5  899.  Summary judgment may not be granted "where divergent ultimate inferences may

6  reasonably be drawn from the undisputed facts."  Fresno Motors, LLC v. Mercedes Benz USA,

7  LLC, 771 F.3d 1119, 1125 (9th Cir. 2015); see also Holly D. v. Cal. Inst. of Tech., 339 F.3d 1158,

8  1175 (9th Cir. 2003).  Inferences are not drawn out of the air, and it is the opposing party's

9  obligation to produce a factual predicate from which the inference may be drawn.  See Fitzgerald

10  v. El Dorado Cnty., 94 F.Supp.3d 1155, 1163 (E.D. Cal. 2015); Sanders v. City of Fresno, 551

11  F.Supp.2d 1149, 1163 (E.D. Cal. 2008).  ""A genuine issue of material fact does not spring into

12  being simply because a litigant claims that one exists or promises to produce admissible evidence

13  at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Bryant v.

14  Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  The parties have the

15  obligation to particularly identify material facts, and the court is not required to scour the record in

16  search of a genuine disputed material fact.  Simmons v. Navajo Cnty., 609 F.3d 1011, 1017 (9th

17  Cir. 2010). Further, a "motion for summary judgment may not be defeated . . . by evidence that is

18  'merely colorable' or 'is not significantly probative.'"  Anderson, 477 U.S. at 249-50; Hardage v.

19  CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  If the nonmoving party fails to produce

20  evidence sufficient to create a genuine issue of material fact, the moving party is entitled to

21  summary judgment.  Nissan Fire, 210 F.3d at 1103.

22

23                                    **FACTUAL BACKGROUND**[2]

24          Agreserves is in the business of growing almonds and pistachios in Wasco, California.  See

25

26  [2] "DUMF" refers to Defendants' Undisputed Material Fact, and "PUMF" refers to Plaintiff's Undisputed Material
Fact.  The parties make numerous objections to the proffered undisputed facts.  Most of the objections are unnecessary
and without merit.  Objections that are not expressly addressed in this order are deemed overruled for purposes of

27  Defendants' motions.  The Court notes that Defendants have improperly cited the California Evidence Code in almost
all of their objections.  It is the Federal Rules of Evidence, not the California Evidence Code, that apply in this case.

28  See Fed. R. Evid. 101; Primiano v. Cook, 598 F.3d 558, 563 (9th Cir. 2010); United States v. Sacco, 491 F.2d 995,
1003 (9th Cir. 1974).

DUMF 1.  Agreserves has both seasonal and permanent employees.  DUMF 2.  Agreserves employed Robles from February 4, 2013 to April 1, 2013 as an agricultural temporary, seasonal farm laborer and sprayer, i.e. performing manual labor on the farmland.  DUMF 3.  Robles earned $8.75 per hour with Agreserves, and was an at-will employee.  <u>See</u> DUMF's 4, 5.  Robles was interviewed and hired by Payne.  <u>See</u> PUMF 31; Defendants' Response to PUMF 31; Doc. No. 36 at 22:23-24.  Payne was Agreserves Farm Production Manager and Robles's supervisor.  DUMF 6.

At the outset of Robles's employment, Robles participated in a multi-hour orientation where Agreserves's workplace policies where explained, including the work stoppage practices for legally compliant meal and rest periods.  <u>See</u> DUMF 10.  Agreserves's policy is to provide all lawful and compliant meal and rest periods to its employees by ceasing operations and stopping work for all non-exempt agricultural employees.  <u>See</u> DUMF 9.

Campo was a foreman who worked with Robles for three weeks, about February 4 to February 25.  DUMF 7.  Campo had no authority to hire, fire, demote, promote, or make other material changes to Robles's employment, or with respect to any other employee.  DUMF 8.  However, Campo assigned Robles day to day job duties, Robles had to follow Campo's instructions, and Campo would supervise Robles's work.  <u>See</u> PUMF's 2, 3, 5; Campo Dec. ¶ 2.

During the time Robles worked under Campo, Campo would tell Robles almost daily things like:  "Your religion is nothing, less than my religion," or "I'm a better person than you guys because your religion is less than my religion," or "You are less than me.  I have a better job than you guys.  I'm a Mormon and you guys are less than me," or "My religion is on top.  We are better than anyone else."  PUMF's 74, 75, 76, 77.  Robles is Catholic and Campo is Mormon.  <u>See</u> PUMF's 71, 73.  Robles was also forced or required to participate in a Mormon prayer about 3 times, once in the shop and twice in the field.  <u>See</u> PUMF 78; Robles Depo. 438:19-439:23.

Around mid-February 2013, Robles and 4 or 6 co-workers (who were Mexican) were sent to fix part of the irrigation system.  <u>See</u> Robles Depo. 115:2-7; Robles Dec. ¶ 9.  Robles and the others were traveling from North to South on 4-wheeler motorcycles, which make a lot of noise.  <u>See</u> Robles Depo. 115:7-9.  As the group was traveling, they began to hear someone was shooting a gun.  <u>See</u> <u>id.</u> at 115:9-12.  Robles did not know which directions the shots were coming from.

See id. at 115:12-13.  After the scene became quiet, some of the coworkers said that it was Campo who fired the shots, because he was the only one who did that.  See id. at 115:13-16.  The group continued traveling when Robles again heard shooting "in front of us."  See id. at 115:16-18.  The group then saw a pack of coyotes running from East to West.  See id. at 115:118-20.  Coyotes and other vermin pose a danger to employees and the worksite, see DUMF 44; Campo Dec. ¶ 5, and the repair work that Robles was performing was due to wild animals (including coyotes) gnawing on the irrigation lines.  See Robles Depo. 116:16-117:6.  Robles declares that Campo was directing gunfire towards the workers; Campo declares he was shooting at the coyotes because of the dangers they pose, and he did not aim or shoot at humans.  See Robles Dec. ¶ 9; Campo Dec. ¶ 5.

For three days, while working under Campo, Robles was not given the opportunity to take a meal break while at the machine shop because he was ordered to sweep.  See PUMF 91; Robles Depo. 121:16-122:25.  When other workers were taking a meal break, "John" (who was in charge of the mechanics) told Robles that Campo ordered Robles to sweep.  See PUMF 90.  Also, for an additional seven days while working under Campo, Robles was not given the opportunity to take a meal break in the field because Campo said that the work was urgent and had to be finished before a break could be taken.  See PUMF 92.[3]  Robles did take the state-mandated twenty minute rest periods while working under Campo.  See DUMF 11.

On February 11, 2013, Campo gave Robles a ride from one worksite to another.  See DUMF's 39, 40, 41; PUMF 82.  During the ride, Robles complained about Campo making him sweep and missing the meal break.  See Robles Depo. 123:9-24.  Campo then became upset, started hitting the seat, and hit Robles's hand two or three times.  See id.; DUMF 40; PUMF 82.  Campo also became upset during a telephone call with his wife.  See PUMF 88.  Robles asked Campo to let him out of the car, but Campo refused and continued driving for an additional 15

---

[3] PUMF 92 is based on Paragraph 24 of Robles's Declaration.  Defendants object in part that Paragraph 24 is a sham because it contradicts Robles's deposition.  In his deposition, Robles was asked:  "To be clear, the only individual that directly told you to not take a break and to do sweeping instead was this John, correct?"  Robles responded, "Yes."  See Robles Depo. 124:5-10.  However, this deposition passage is referring to sweeping.  The cited deposition passage does not refer to incidents in the field, where Campo allegedly prevented Robles from taking a break.  Because different incidents appear to be involved, the Court cannot say that Paragraph 24 of Robles's Declaration contradicts Page 124 of Robles's Deposition to such a degree that the declaration is a sham.  See Yeager v. Bowlin, 693 F.3d 1076, 1080 (9th Cir. 2012).  Defendants' objection is overruled.

1  minutes.  See DUMF 38; see also PUMF 88.

2       Beginning in March 2013, Robles worked in a pesticide spraying crew under foreman

3  Miguel Cervantes ("Cervantes").  See PUMF's 12, 13.  Robles complained to Cervantes and

4  showed Cervantes a diagram that depicted how Campo was shooting coyotes and endangering

5  Robles's safety.  See PUMF 18.  Cervantes responded that he would tell Payne, who was

6  Cervantes's supervisor.  See PUMF"s 14, 18.[4]  Robles also complained to Cervantes that Campo

7  had hit him (Robles) while Campo was driving the truck, and that Robles had been placed in fear

8  of his life.  See PUFM 89.  Robles also told Cervantes that he did not want to pray by force, and

9  Cervantes responded, "We have to follow the orders."  PUMF 79.  Robles also complained to

10 Cervantes about Campo not allowing Robles to take meal breaks, and Cervantes responded,

11 "We'll look into it."  See Cervantes Depo. 125:4-11; PUMF 96.

12      For twelve days while working under Cervantes, Robles was not given a meal break.  See

13 PUMF 93.[5]  Cervantes told Robles that Robles had to transport pesticide to the sprayers in the

14 field and if Robles took meal breaks, then the sprayers in the field would have to stop working, as

15 they would run out of pesticide.  See id.  Robles's pay checks and payment summary from

16 Agreserves do not show one hour of extra pay for any of the days Robles was prevented from

17 having his meal breaks.  See PUMF's 95, 102.

18      On March 14, 2013, Robles was driving a tractor, and the tractor was laying down hose.

19 See PUMF 108.  Two employees were walking behind the tractor and placing the hose next to

20 almond trees.  See id.  Robles had to regulate his speed so that the two workers behind him could

21 safely perform their jobs.  See PUMF 109.  Robles told foreman Salvador Estrada that he (Robles)

22

23  [4] Defendants object that testimony about what Cervantes said is hearsay.  However, Cervantes's statements appear to

24  fit under Federal Rules of Evidence 801(d)(2)(D), see Nigro v. Sears, Roebuck, & Co., 784 F.3d 495, 498 (9th Cir. 2015), and/or 803(3), see United States v. Bishop, 291 F.3d 1100, 1110 (9th Cir. 2002).

25  [5] Defendants dispute PUMF 93 on the same grounds they dispute PUMF 92, including that the relevant portion of Robles's declaration is a sham.  For the same reasons discussed with respect to PUMF 92, the Court cannot conclude

26  that PUMF 93 is based on a "sham" declaration.  See Footnote 3, supra.  Additionally, Defendants object that there is no evidence that Cervantes had any authority to prevent Robles from taking a meal break.  However, Cervantes

27  interviewed Robles during the hiring process, Cervantes was a foreman, and Robles worked under Cervantes.  See Robles Dec. ¶ 44; PUMF's 12, 13.  Given Cervantes's actions, title, and the common understanding of what a foreman

28  does, there is sufficient evidence to infer that Cervantes had authority to direct Robles's actions.  See Narayan , 616 F.3d at 899 (all justifiable inferences are made in the non-movant's favor).

could not drive the tractor faster because the terrain was too ugly or uneven, and the hoses would fall off the trailer and injure the hose layers.  See PUMF's 35, 110, 119.  Estrada said that he did not care, Robles was nobody, and that Robles was to do what he was told or go home.  See PUMF 111.  Robles felt obligated to follow Estrada's instructions and began to drive faster.  See PUMF 113.  As Robles drove faster, the two hose layers stumbled and fell.  See PUMF 114.  When Robles saw one of the hose layers fall and be dragged by a hose (because he did not let go), he called Cervantes and complained that he was being forced to drive fast and at an unsafe speed. See PUMF's 115, 117.  As Robles was driving fast, the tractor's seat became lose and got stuck forward.  PUMF 121.  Robles was unable to leave the tractor.  Id.  Another worker, who was not a mechanic and did not know how to fix a tractor seat, nevertheless tried to fix the set.  See PUMF 122.  Robles had stopped, but as he resumed driving, he had to loosen the seatbelt because the uneven terrain was causing him to be tossed around, which hurt his back.  See PUMF 123. Robles's knees hit the steering wheel column of the tractor as he was driving, which injured his knees.  See PUMF 124.  The uneven terrain and loose tractor seat caused Robles's knees to hit the steering column multiple times.  See PUMF's 35, 125.  Plaintiff reported to another foreman (Alvaro Meza) that the seat had become loose, that he again banged himself, and that he was in a lot of pain.  See PUMF 126.  Robles parked the tractor about 30 minutes before the end of his shift to report his injury.  PUMF 127.  Robles reported that he had been involved in a workplace accident in which he hit his knee while operating a tractor.  See DUMF 14.  Robles reported that he was in a lot of pain and said that if no report would be made for workers' compensation, and if Agreserves would not send him to a doctor, then he wanted to go home.  See PUMF 48.

On March 15, 2013, Robles reported his injury to Lee Brown, a farm operations manager, but Brown told Robles that he was lying and refused to create a workers' compensation report. See PUMF 128.  Robles later complained to a Company Vice President about the rough terrain, being forced to drive at an unsafe speed, and being injured from the tractor seat.  See PUMF 129.

Also on March 15, 2013, Robles was taken to a doctor by foreman Jason Barnum in order to see if Robles had healed sufficiently to work.  See PUMF's 19, 135.  Robles complained about Campo talking about religious stuff and saying that he was better than everyone else.  See

PUMF's 20, 21, 80, 134.  Robles told Barnum that he had complained to Cervantes about Campo, but Cervantes had done nothing.  See PUMF's 22, 81, 134. Robles also told Barnum that he was not being given breaks and had been forced to drive the tractor unsafely or go home.  See PUMF's 130, 131, 134.  At the doctor's office, Barnum contradicted the doctor in front of Robles, and asked the doctor to take Robles off work for a few days to rest.  PUMF 136.  Barnum told Robles that Robles would have to rest because Agreserves did not have light duty work.  PUMF 137.  The doctor placed Robles off of work for approximately two weeks.  See Robles Depo. 378:11-18.

After Robles complained about being injured on the tractor, Payne began to conduct an investigation over the workplace accident, and collected reports and statements from witnesses and employees.  See DUMF 15.[6]  During Payne's investigation into the tractor accident, he received reports that Robles had multiple negative confrontations with co-workers and supervisors. DUMF 16; see also Payne Dec. Ex. 1.  Prior to March 14, 2013, no one told Payne that Robles was belligerent or insubordinate. PUMF 105.  Payne ended up performing two concurrent investigations involving Robles:  one for Robles's accident, and a second related to complaints about Robles's conduct.  DUMF 17.

On March 28, 2013, Payne met with Robles to investigate both the workplace accident and Robles's reported misconduct towards other employees.  See DUMF 18.  During the meeting, Payne asked Robles questions about the accident and the reported misconduct.  See DUMF 19.  Robles admitted to not wearing his seat belt, but refused to answer Payne's questions about workplace misconduct.  See DUMF 20.  Payne perceived Robles as rude and non-cooperative.  DUMF 21; see also Payne De. ¶ 6.  Because of Robles's conduct during the meeting, Payne told Robles to go home and write a statement about the accident and a response to the misconduct allegations against him by his co-workers.  See DUMF 22.  As a result of Robles's conduct, Payne

---

[6] With respect to a number of Defendants' undisputed facts (such as DUMF 15), Robles attempts to create a dispute by repeating his version of the facts surrounding the accident, his interactions with Campo, or the complaints he made about Campo.  Robles's responses to Defendants' facts generally are extremely lengthy and repetitive, i.e. a lengthy response to one DUMF is cut and pasted as a response to another DUMF.  The responses generally do not directly address the purported fact, rather they are Robles's narrative repeated over and over and over again.  That is not a proper response and it does not create a genuine dispute.  A proper response directly and clearly addresses a purported fact, not a possible inference from the fact; it should be concise, explain the basis for the factual dispute, and cite to evidence that demonstrates a dispute.  There should be no need for the Court to sift through a lengthy narrative in the hopes of finding something that actually addresses and disputes the purported fact.  See Simmons, 609 F.3d at 1017.

1   declares that he made a preliminary decision to terminate Robles, but he wanted to review

2   Robles's written response before making a final decision.  See DUMF 23.

3       Later on March 28, Robles returned to Agreserves and provided a written statement to

4   Payne.  DUMD 24.  Payne noted that Robles's written statement did not address Payne's

5   questions, and Robles had changed his story about wearing his seatbelt.  See DUMF 25.  Payne

6   made the decision to terminate Robles.  See PUMF 103.  After reviewing Robles's statement,

7   Payne declares that he finalized his decision to terminate Robles for the following reasons:  (1)

8   Robles was insubordinate to Payne; (2) Robles refused to cooperate by answering questions about

9   reports of his (Robles's) offensive disruptive conduct towards other employees and supervisors;

10  (3) Robles's refusal to answer questions about the accident and Robles's dishonesty about wearing

11  a seatbelt; (4) Robles failed to follow supervisors' instructions; and (5) Robles failed to follow

12  safe workplace practices by not wearing a seatbelt.  DUMF 31.  Payne was the decisionmaker who

13  terminated Robles's employment.  DUMF 26.  At the time Payne terminated Robles, Payne had no

14  information that other employees had uttered words about Robles's national origin or religion, that

15  Robles had complained about missed meal or rest periods, that Robles had complained about

16  safety issues, or that Payne was Catholic.  See DUMF's 27, 28, 29, 30.[7]  Payne had also

17  considered a written statement from Campo, in which Campo was critical of Robles.  See Payne

18  Depo. 139:12-140:8; Guleser Dec. Ex. 19.  The statement concluded by Campo stating that he

19  would not put with Robles's behavior again and that Robles "is a moral [sic] killer and makes

20  everyone around him uneasy."  Id.  Before Robles's knee injury on March 14, no one suggested

21  that Robles be terminated.  See PUMF 104.  Payne declared that Robles's insubordination and

22  misconduct were the only determinative and substantial motivating reasons for the decision to

23  terminate.  See PUMF 32.

24      Robles was terminated on April 1, 2013.  PUMF 139.  That day, Robles met with Payne

25  and Agreserves's HR Manager, Walter Keenan.  See DUMF 33.  The meeting was in a

26

27  [7] DUMF's 27 and 30 indicate that Payne was not aware of Robles's national origin or of anyone uttering words about
    Robles's national origin.  However, as discussed infra., there is evidence that Payne uttered words about Robles's
28  national origin.  Accordingly, the aspects of DUMF's 27 and 30 that deal with Payne's knowledge or perception of
    Robles's national origin are not accepted for purposes of this motion.  See Narayan, 616 F.3d at 899.

confidential, closed door setting in one of Agreserves's conference rooms so that Payne and

Keenan could explain the decision to terminate Robles and process the termination.  See id.  The

meeting lasted about 5 minutes.  DUMF 35.  Within a minute or two of the start of the meeting,

Robles stated that he wanted to record the meeting, and Payne and Keenan denied Robles

permission to record.  See Payne Dec. ¶ 11; Robles Depo. 155:19-23.  Robles continued to record

the meeting anyway.[8]  See Robles Depo. 155:24-156:3.  When Robles started the recording,

Robles, Keenan, and Payne were sitting around a table.  See id. at 157:6-11.

   The recording begins with Robles telling Payne and Keegan about Campo.  See Robles

Depo. 159:14-160:8.  Robles said that Campo told others about Robles's "situation," that Campo

spoke to others to "put them against" Robles, that Campo almost killed Robles when Campo fired

a rifle near him while trying to kill coyotes, that Robles made a report against Campo, and Payne

and Keenan did not care about Robles's life.  See id.  As Robles was saying this, Payne[9] tried

unsuccessfully to talk to Robles three times by saying either "excuse me, Juan" or "Juan, Juan."

See id.  When Payne was able to speak, he began to say, "Here's your check.  Juan, you're . . .,"

but Robles interrupted and said, "No, no.  You gonna – okay, what, you want to lock me in or

what?"  Id. at 160:14-17.  Payne said, "No, no, wait."  Id. at 160:18.  Robles said that he was

going to go, and that he wanted the termination on paper.  Id. at 160:19-20.  Payne replied that

they had a termination paper there, that he had looked into Robles's allegations, and that he was

terminating Robles based on his behavior at work.  Id. at 160:21-161:25.  Robles replied "No,"

asked about Payne's behavior and said it was illegal, and that now Payne was "try[ing] to stop me

to – to – get out from this door."  Id.  at 161:2-5.  Payne was standing near his chair (which was by

the door) with his side to the door, and Robles was standing in front of Payne.  See PUMF's 147,

148; Robles Depo. 488:10-11.  Payne replied that he and Keegan were not trying to stop Robles,

---

[8] The recording lasted about three minutes.  See DUMF 36.  The recording was played at the deposition and transcribed as part of the deposition by the reporter.  See Robles Depo. 159:9-163:11.

[9] The deposition transcript identifies "J.R." as Robles, and then identifies other speakers as "Voice."  It is not clear whether the "Voice" was Payne or Keenan.  However, from the context, Payne's declaration, and some of Robles's PUMF's, it appears that Payne most likely did most of the speaking.  See PUMF's146-157; Payne Depo. 121:19-122:20. 125:6-128:21; Payne Dec. ¶ 11.  Unless otherwise noted, the Court will assume for purposes of this motion that Payne is the person speaking when the deposition transcript identifies "Voice."

1  and Robles told Payne not to get in his way.  Robles Depo. 161:6-7.  Payne then said that he had

2  Robles's check there, but Robles then stated that everything was under protest, the situation was

3  illegal, and that Campo put his life in danger by shooting the rifle.  Id. at 161:8-14.  Payne

4  eventually said that he would look into the situation and that Robles was terminated, and Payne

5  again tried to give Robles the pay check.  See id. at 161:15-24.  Robles said that he was going to

6  go to the Sheriff to report Campo, and Payne replied it was Robles's right to do so.  See id. at

7  161:23-162:4.  Robles replied that Payne was going to try and stop him, but Payne interrupted

8  Robles and said that they were not going to stop him and again tried to give Robles his pay check.

9  See id. at 162:5-8.  Payne asked if Robles wanted the money, to which Robles responded by

10 asking why they did not pay him right away.  See id. at 162:9-11.  Payne and Keenan replied that

11 they were paying Robles, and Robles asked who was going to pay him the days he was not

12 working.  See id. at 162:12-15.  Payne responded that if Robles would let him finish, he would

13 explain to Robles that this was included as part of the check.  See id. at 162:16-18.  Robles asked

14 to be shown a letter, but refused to open an envelope, and said that he was not getting anything.

15 See id. at 162:19-22.  Payne again asked if Robles wanted the pay check.  See id. at 162:23-24.

16 Robles responded that he was not getting anything, and for Payne to get out of his way.  See id. at

17 162:25-163:1.  Keegan instructed Payne (or vice versa) to unlock the doors (at some point the

18 doors had been locked).  See id. at 163:2, 487:5-15.  Robles then told Payne, "don't get in my

19 way.  You harassing me and I don't – and – and back off, back off, back off."  Id. at 163:3-5.

20 Payne said, "Hey, you need this letter."  Id. at 163:6.  Robles responded, "don't get close to me

21 anymore.  I don't care.  I'm protecting myself.  You tried to stop me from get out from the door so

22 fuck you."  Id. at 163:6-10.  The recording then ended.  See id. at 163:11.

23        Apparently after the recording stopped, Robles left the room.  See PUMF 155.  As Robles

24 was walking in the lobby, Payne came in front of him.  See PUMF 155.  Robles raised his hands

25 and told Payne to move back and not touch him; Payne moved out of the way.  See id.  As Robles

26 was exiting the building, Payne blocked the exit by putting his back to the doors.  See PUMF's

27 156, 157.  Payne later moved out of the way, and Robles left.  See Robles Depo. 488:2-20.

28        At some point during the meeting in the conference room, Robles had slapped the check

11

1  and paper work away from Payne, and Payne pushed Robles's shoulders.  See Payne Dec. ¶ 11;

2  Robles Depo. 488:21-25.[10]  Also, it appears that after Payne pushed Robles, Payne repositioned

3  himself in front of the door to prevent Robles from leaving.  See Robles Depo. 167:10-22.

4     During his employment at Agreserves, Robles heard Payne use the phrase "fucking

5  Mexican" three to six times when referring to Robles.  See PUMF 23.[11]  Once, Robles overheard

6  Payne's voice when Cervantes called Payne about a truck that Robles was driving and the speed at

7  which Robles was doing a job.  See Robles Depo. 455:15-459:5.  Cervantes's phone was

8  connected to the speakers of a truck, so Robles could hear Payne.  See id.  Other times, when

9  Robles or other would make a mistake, Payne would say "stupid Mexicans."  See id. at 200:2-11.

10     After Campo's behavior towards Robles, Robles was always biting his lip because he felt

11  so much anxiety that he feared for his life.  See DUMF 162.  Robles felt that he Agreserves was a

12  very stressful place to work.  See id.  After his termination, Robles felt more symptoms of anxiety

13  and depression, and he wanted to be alone because he was remembering all the incidents that

14  happened at Agreserves.  See PUMF 163.  Robles had nightmares, cried, felt stressed, pushed his

15  kids away, isolated himself, experienced panic attacks, had memory loss, could not relax quickly,

16  and fought with his wife.  See PUMF's 164, 165, 166.  Robles believed his behavior was due to

17  the illegal conduct and termination by Agreserves.  See id.  Robles was treated at a clinic for

18  mental injuries that he believes were caused by Defendants' conduct.  See PUMF 167.  Robles

19  takes anti-depressants and medication to prevent anxiety attacks.  See PUMF 168.

20

---

21  [10] Defendants object to Robles's testimony.  Defendants cite Federal Rule of Evidence 1002, the "best evidence rule,"
    and argue that the recording speaks for itself.  Rule 1002 reads in part, "An original . . . recording . . . is required in
22  order to prove its content unless these rules or a federal statute provides otherwise."  Defendants' objection is
    unpersuasive because Rule 1002 does not apply to Robles's testimony.  Robles was not testifying as to the content of
23  the recording at the relevant point in his deposition.  See United States v. Diaz-Lopez, 625 F.3d 1198, 1202 (9th Cir.
    2010) (noting that Rule 1002 "does not apply to exclude testimony which concerns the document without aiming to
24  establish its terms . . . .") (quoting 4 John Henry Wigmore, Evidence in Trials at Common Law, § 1242 at 574) (James
    H. Chadbourn rev. 1972)); United States v. Bennett, 363 F.3d 947, 953 (9th Cir. 2002) ("[Rule 1002]'s application
25  turns on whether contents are sought to be proved.").  Also, as a participant in the conversation, Robles's testimony is
    equally admissible as the recording in order to prove the content of the conversation.  United States v. Gonzalez-
26  Benitiez, 537 F.2d 1051, 1053-54 (9th Cir. 1976).  In any event, a copy of the recording was not provided to the
    Court.  Whether the sounds of pushing (or paper being slapped away) can be heard on the recording is entirely
27  unknown.

28  [11] Payne denies that he ever said anything derogatory regarding Mexicans.  See Payne Dec. ¶ 10.  However, for
    purposes of summary judgment, Robles's version of events is credited.  Narayan, 616 F.3d at 899.

**DEFENDANTS' MOTIONS**

**I.     PAYNE'S MOTION**

    **A.     5th Cause of Action – Battery**

    *Defendant's Argument*

       Payne argues that Robles's battery claim against him is based on conduct that occurred in the conference room during the April 1 termination meeting.  Specifically, Payne allegedly pushed Robles.  Payne argues that the battery claim is preempted by California's Workers' Compensation law because the minor interaction identified by Robles is a normal part of the employment relationship.

    *Plaintiff's Opposition*

       Robles argues that the Labor Code permits an employee to bring a lawsuit if an employee's injuries are caused by a willful assault.  Physical aggression has consistently been exempted from the workers' compensation exclusivity rule.  Battery has no proper place in an employment relationship, so this claim is not preempted.

    *Legal Standard*

       California Labor Code § 3600(a) provides that, subject to certain exceptions, "workers' compensation liability, 'in lieu of any other liability whatsoever' will exist 'against an employer for any injury sustained by his or her employees arising out of and in the course of the employment." Fermino v. Fedco, Inc., 7 Cal.4th 701, 708 (1994) (citing Cal. Labor Code § 3600(a)); Jones v. Department of Corrections & Rehab., 152 Cal.App.4th 1367, 1383 (2007). Conduct is within the scope of employment if the injury is an outgrowth of the employment, the risk of injury is inherent in the workplace, or the injury is typical of or broadly incidental to the employer's enterprise. Torres v. Parkhouse Tire Serv., Inc., 26 Cal.4th 995, 1008 (2001); Jones, 152 Cal.App.4th at 1384. "In bringing [people] together, work brings [personal] qualities together, causes frictions between them, creates occasions for lapses into carelessness, and for fun-making and emotional flare-up . . . .  These expressions of human nature are incidents inseparable from working together.  They involve risks of injury and these risks are inherent in the working environment." Torres, 26 Cal.4th at 1009; Jones, 152 Cal.App.4th at 1384.  However, the

13

1    workers' compensation laws will not prevent an employee from bringing a suit against a fellow

2    employee for damages where "the employee's injury . . . is proximately caused by a willful and

3    unprovoked physical act of aggression of the other employee." Cal. Lab. Code § 3601(a)(1); see

4    Torres, 26 Cal.4th at 1002.  To fit within this exception, as a general rule the co-employee's

5    physical act of aggression must be accompanied by an intent to injure.  Torres, 26 Cal.4th at 1006;

6    Jones, 152 Cal.App.4th at 1383.

7         *Discussion*

8         The conduct at issue appears to be a single push or shove by Payne to Robles's shoulders,

9    while Payne was trying to terminate Robles.  There is no description of the push/shove by Robles

10   in his opposition, and Robles's deposition is not particularly descriptive.  Based on the evidence

11   presented, the Court can only conclude that the push from Payne is a relatively minor "flare up"

12   that is an inherent risk of the workplace.  See Torres, 26 Cal.4th at 1009; Jones, 152 Cal.App.4th

13   at 1384 (finding assault and battery claims based on one worker grabbing another by the arm and

14   "banging her around" due to a dispute over use of a wheelbarrow were preempted by workers'

15   compensation).  No intent to injure by Payne is apparent.  Cf. Cal. Lab. Code § 3601(a)(1).  Thus,

16   the battery claim against Payne is preempted by § 3600(a).  See Jones, 152 Cal.App.4th at 1384.

17        In opposition, Robles cites Labor Code § 3602(b).  In relevant part, that law provides an

18   exception to the workers' compensation exclusivity rule for certain lawsuits.  An employee may

19   sue his employer where "the employee's injury . . . is proximately caused by a willful physical

20   assault by the employer." Cal. Lab. Code § 3602(b)(1).  Robles reliance on § 3602(b)(1) is

21   misplaced.  By its express terms, § 3602(b)(1) only applies when the claim is one by an employee

22   against the *employer*.  See Cal. Labor Code § 3602(b)(1).  Liability under § 3602(b)(1) "must be

23   based on positive misconduct by the *employer* and not on a theory of vicarious liability such as

24   that which forms the basis of the doctrine of respondeat superior." Fretland v. County of

25   Humboldt, 69 Cal.App.4th 1478, 1487 (1999) (emphasis added).  Here, because Robles was

26   employed by Agreserves, not Payne, see DUMF 4, § 3602(b)(1) does not apply.

27        To the extent that Robles meant to cite § 3602(a)(1) (which permits suits against a fellow

28   employee for willful aggression), for conduct to fit under § 3602(a)(1), the intent to injure the

1   plaintiff is generally required.  See Torres, 26 Cal.4th at 1006; Jones, 152 Cal.App.4th at 1383; cf.

2   Soares v. City of Oakland, 9 Cal.App.4th 1822, 1828 (1992) (intent to injure required to fit with

3   exclusivity exception of § 3602(b)(1)).  As discussed above, the minimal evidence presented on

4   this point does not support an inference that Payne intended to injure Robles by merely pushing

5   him.  Therefore, § 3602(a)(1) does not apply.  See id.

6        Summary judgment on this claim is appropriate.

7        **B.        15th Cause of Action – False Imprisonment**

8        *Defendant's Argument*

9        Payne argues that the elements of false imprisonment cannot be met.  First, the conference

10  room door locked from the inside in order to keep people on the outside from entering, so people

11  on the inside could not be locked in.  Robles was also told that he could leave the conference

12  room, and he did.  The recording contradicts any arguable false imprisonment.  Second, there was

13  a lawful privilege for asking Robles into a closed door meeting because he was being terminated.

14  Informing an employee of a termination is a normal part of the employment relationship.  Third,

15  there is no evidence that the "confinement" was non-consensual.  Robles surely did not want to be

16  there because he was being terminated, but there is over 3 minutes of audio-recording where

17  everyone is talking about Robles's paycheck and termination.  Robles voluntarily entered the

18  room to talk to Payne and Keenan.  Fourth, there was no appreciable length of time that Robles

19  was falsely imprisoned.  Any imprisonment lasted less than 5 minutes, and the audio recording

20  was about 3 minutes.  At best, Robles's desire to not be in the room where he was being

21  terminated was a fleeting emotion.

22       *Plaintiff's Opposition*

23       Robles argues that PUMF's 145 to 158 demonstrate that Payne falsely imprisoned him

24  during the April 1 termination meeting in the conference room.  These PUMF's in part indicate

25  that Robles felt that he could not get out of the room, he told Payne and Keegan that they

26  prevented him from getting out of the door, he tried to exit the room twice, the door was locked,

27  and Payne had physically blocked the door.  Robles argues that the factual contentions in PUMF's

28  145 to 158 create questions of fact that must be resolved by the jury.

1      *Legal Standards*

2          The elements of a claim for false imprisonment are: "(1) the nonconsensual, intentional

3   confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time,

4   however brief."  <u>Young v. County of Los Angeles</u>, 655 F.3d 1156, 1169 (2011); <u>Shoyoye v.</u>

5   <u>County of Los Angeles</u>, 203 Cal.App.4th 947, 962 (2012); <u>see also</u> <u>Fermino v. Fedco, Inc.</u>, 7

6   Cal.4th 701, 715 (1994).  Restraint or confinement "may be effectuated by means of physical

7   force, threat of force or of arrest, confinement by physical barriers, or by means of any other form

8   of unreasonable duress."  <u>Fermino</u>, 7 Cal.4th at 715 (citations omitted); <u>Schofield v. Critical Air</u>

9   <u>Medicine, Inc.</u>, 45 Cal.App.4th 990, 1001 (1996).  "The only mental state required to be shown to

10  prove false imprisonment is the intent to confine, or to create a similar intrusion."  <u>Fermino</u>, 7

11  Cal.4th at 716.

12      *Discussion*

13          Payne makes five arguments in favor of summary judgment on this claim.  However, the

14  Court is not convinced that summary judgment is justified on the basis of any of these arguments.

15          First, there appears to be no dispute that the conference room door locked from the inside.

16  Nevertheless, Robles testified that at some point during the conversation (apparently just after he

17  requested a "paper"), Payne stood up, blocked the door, and prevented Robles from leaving the

18  room.  <u>See</u> Robles Depo. 167:10-22.  At other points during the meeting, Payne was standing near

19  his chair, which was near the door.  <u>See</u> PUMF 147.  Thus, confinement was being accomplished

20  through Payne's physical actions, not through the lock per se.

21          Second, the Court concedes that there is nothing unlawful about requiring an employee to

22  attend a closed door meeting, especially if there is something sensitive occurring like a

23  termination.  Nevertheless, the apparent confinement occurs right around the time that Robles

24  understands that he is being terminated.   <u>Cf.</u> Robles Depo. 167:10-22 <u>with</u> Robles Depo. 160:14-

25  161:22.  It is clear that Payne wanted to give Robles final paperwork and a paycheck, but Robles

26  was not willing to accept these after the termination.  With the termination, Robles was no longer

27  an employee, and thus, would not be required to follow any of Agreserves administrative

28  processes.  Payne cites no authority that would allow him to block Robles from leaving the room.

1    Without citation to authority that recognizes such a privilege, the Court cannot accept Payne's

2    argument.

3          Third, the recording is of limited value.  The recording is audio only, and does not reflect

4    body language or body positioning.  It is clearly possible to falsely imprison someone without

5    saying a word.  The portion of Robles's deposition that states that Payne stood in front of the door

6    and blocked Robles from leaving would not necessarily be reflected in the recording.  Further, the

7    recording has not been produced, so the Court cannot hear the tone of voice being used by Robles,

8    Payne, or Keenan, nor can the Court hear background noises that may be relevant.  Finally, the

9    Court agrees that one reasonable interpretation of the recording is that Robles and Payne are

10   spending a lot of time talking about either Campo or paperwork, and only a small part talking

11   about Robles leaving.  This would tend to indicate consent for most of the conversation and an

12   inappreciable period of confinement.  However, Robles at several points in the recording makes

13   reference to being locked in, not being allowed to leave, and Payne being in his way.  When

14   combined with Robles's deposition, the recording can also be interpreted as reflecting a non-

15   consensual, appreciable confinement.  Because the recording can reasonably be interpreted in

16   several ways, including one that is favorable to Robles, the recording does not dictate granting

17   summary judgment.  See Fresno Motors, 771 F.3d at 1125; Holly D., 339 F.3d at 1175.

18         Fourth, there does not appear to be any case law that sets a floor as to what constitutes an

19   appreciable period of time.  In Fermino, the California Supreme Court cited a case with approval

20   that a period as short as 15 minutes was sufficient.  See Fermino, 7 Cal.4th at 715 (citing

21   Alterauge v. Los Angeles Turf Club, 46 Cal.3d 1092, 1123 (1988)).  However, at least one

22   California Court of Appeals has held that Fermino's observation about 15 minutes was not meant

23   to set a floor.  See People v. Callier, 2010 Cal. App. Unpub. LEXIS 1100, *10-*12 (Feb. 18,

24   2010).[12]  Callier also noted some cases that had found actionable false imprisonment in which the

25   time frame involved appeared significantly less than 15 minutes.  See id. (citing People v.

26   Fosselman, 33 Cal.3d 572, 1146 (1983) (defendant put a knife to a woman's back and his hand on

27

28   ─────────────
     [12] Despite state rules, the Court may consider unpublished state cases as persuasive authority.  See Employers Ins. of
     Wausau v. Granite State Ins. Co., 330 F.3d 1214, 1220 n.8 (9th Cir. 2003); Altman v. HO Sports, 821 F.Supp.2d
     1178, 1189 n.4 (E.D. Cal. 2011).

1    her shoulder, began to walk her behind a building, but the woman fell and ran into the street where

2    passers-by helped her); People v. Straight, 230 Cal.App.3d 1372 (1991) (woman was held and

3    groped in intimate areas of her body by defendant, but as defendant tried to take two steps with the

4    woman, the woman was able to scream and the defendant left)).[13]  Here, based on the recording, it

5    appears that any non-consensual confinement lasted between 2 and 3 minutes.  This is not a

6    particularly long period of time, but the requirement is that there be an appreciable period of time,

7    however brief or short.  Young, 655 F.3d at 1169; Fermino, 7 Cal.4th at 715; Shoyoye, 203

8    Cal.App.4th at 962.  Further, the 2 to 3 minutes is accompanied by several comments by Robles

9    about being locked in or wanting to leave and Payne physically blocking the exit.  The Court finds

10   that reasonable minds could differ on this issue.  As such, a jury will have to determine whether

11   Robles was confined for an "appreciable period of time."  See Fresno Motors, 771 F.3d at 1125;

12   Holly D., 339 F.3d at 1175.

13        Summary judgment on this claim will be denied.

14        **C.        16th Cause of Action – Intentional Infliction of Emotional Distress ("IIED")**

15        *Defendant's Argument*

16        Payne argues *inter alia* that there is a failure to meet the required elements of an IIED

17   claim.  The evidence does no show that his conduct was sufficiently "outrageous."  Robles's claim

18   is based on a meeting that lasted less than 5 minutes, and in which Payne and Robles were

19   discussing the termination and paperwork.  Furthermore, there is a failure of intent because Payne

20   did not intend to cause Robles severe emotional distress.

21        *Plaintiff's Opposition*

22        Robles argues that Payne's conduct was an abuse of his position over Robles and was a

23   violation of the law against false imprisonment.  Payne's conduct caused emotional distress and

24   caused Robles to fear for his safety.  A reasonable trier of fact could look at the evidence and

25   conclude that Payne's conduct was sufficiently outrageous.

26

27   _____

[13] The Court recognizes that these are criminal cases.  However, the California Supreme Court has explained that the tort of false imprisonment is "identically defined" as the crime of false imprisonment.  See Fermino, 7 Cal.4th at 715.

28   Because of the identical definitions, criminal false imprisonment cases may be consulted in civil cases.  See Scofield v. Critical Air Medicine, Inc., 45 Cal.App.4th 990, 1001 (1996).

1    *Legal Standards*

2    The elements of the tort of IIED are:  (1) extreme and outrageous conduct by the

3    defendant; (2) the defendant's intention of causing, or reckless disregard of the probability of

4    causing, emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and

5    (4) actual and proximate causation of the emotional distress by the defendant's outrageous

6    conduct.  Hughes v. Pair, 46 Cal.4th 1035, 1050 (2009); Potter v. Firestone Tire & Rubber Co., 6

7    Cal.4th 965, 1001 (1993).  "'Severe emotional distress' means emotional distress of such

8    substantial quality or enduring quality that no reasonable person in a civilized society should be

9    expected to endure it."  Hughes, 46 Cal.4th at 1051; Potter, 6 Cal.4th at 1004.  Conduct is

10   "extreme and outrageous" when it is "so extreme as to exceed all bounds of that usually tolerated

11   in a civilized community."  Hughes, 46 Cal.4th at 1050; Potter, 6 Cal.4th at 1001.  Evidence that

12   reflects "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" is

13   insufficient.  Hughes, 46 Cal.4th at 1051.

14   *Discussion*

15   After reviewing the evidence, two elements of IIED have not been met.  First, there is

16   insufficient evidence of "extreme and outrageous" behavior.  Robles's claim is based on the events

17   at the termination meeting, and in particular his contention that he was falsely imprisoned.

18   However, the meeting lasted 5 minutes, and of those 5 minutes, the last 3 appear to have been

19   recorded.  The 3 minutes of recording reflect an agitated Robles who did not want to be

20   terminated, who wanted some kind of paper work related to the termination, and who wanted to

21   complain about how he had been treated up to that point by Agreserves employees.  See Robles

22   Depo. 159:13-163:10.  There is no evidence that Payne said anything insulting or threatening

23   during the meeting.  The recording reflects that Robles requested to leave, and was told that he

24   could do so.  However, shortly after saying he wanted to leave, Robles continued to talk and

25   Payne continued to attempt to give Robles paperwork.  At most, Payne was blocking the door for

26   between 2 and 3 minutes during a conversation that was dominated by Robles.  This is not

27   "extreme and outrageous" conduct by Payne that exceeds all bounds tolerated in a civilized

28   society.  See Hughes, 46 Cal.4th at 1050.  Second, there is no evidence that suggests Payne

19

1   intended to cause severe emotional distress.  Payne has declared that he had no such intent, see

2   Payne Dec. ¶ 12, and the conduct at issue is not the type that could reasonably be expected to

3   cause severe emotional distress.  Without intent and outrageous conduct, Robles cannot recover

4   for IIED.  See Hughes, 46 Cal.4th at 1050.

5        Robles relies on *Robinson v. Hewlett-Packard Corp.*, 183 Cal.App.3d 1108, 1130 (1986)

6   in support of his arguments.  *Robinson* involved the use of racial comments.  See id. at 1128.  In

7   addressing an IIED claim, *Robinson* cited *Agarwal v. Johnson*, 25 Cal.3d 932, 946 (1979) for the

8   proposition that behavior may be considered "outrageous" for purposes of IIED if a defendant:  (1)

9   abuses a relation or position which give him power to damage the plaintiff's interest; (2) knows

10  the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally with the

11  recognition that the acts are likely to result in illness through mental distress.  Agarwal, 25 Cal.3d

12  at 1130; see also Fermino, 7 Cal.4th at 713.

13       Here, there has been no showing that *Agarwal*'s criteria have been met.  First, Payne's

14  conduct in temporarily blocking the door did not harm Robles's interests, appears to have occurred

15  after Payne lost his position of authority over Robles, and was not particularly abusive in light of

16  the purpose of the meeting and the nature of what was actually said (as discussed above).  Second,

17  there is no evidence that Payne knew that blocking the door would likely cause illness through

18  mental distress.  Third, there is no evidence that Payne knew Robles was particularly susceptible

19  to mental distress.  In short, Robles has done little more than cite *Robinson* without applying it.

20  Robles has not shown that *Robinson* or *Agarwal* apply in this case.

21       Summary judgment in favor of Payne on this claim is appropriate.

22

23  **II.    CAMPO's MOTION**

24       **A.  1st & 2nd Causes of Action – Title VII – National Origin and Religion**
             **Harassment, Discrimination, & Retaliation**

25  *Parties' Arguments*

26       Campo argues that, because he is an individual, he cannot be held liable under Title VII for

27  any harassment, discrimination, or retaliation.  Robles does not respond to this argument.

28

1    *Discussion*

2        Campo is correct.  The Ninth Circuit has clearly held that individual supervisors and

3    coworkers cannot be liable under Title VII.  See Craig v. M&O Agencies, Inc., 496 F.3d 1047,

4    1058 (9th Cir. 2006); Holly D., 339 F.3d at 1179; Miller v. Maxwell's Int'l, Inc., 991 F.2d 583,

5    587-88 (9th Cir. 1991).  Accordingly, summary judgment in favor of Campo on the first and

6    second causes of action is appropriate.  See id.

7    **B.  3rd Cause of Action – FEHA & California Constitution– National Origin**

8        **Harassment**

9        *Defendant's Argument*

10       Campo argues that he did not use the term "stupid" Mexican, and the "rifle incident" had

11   nothing to do with Robles's national origin.  At best, the incidents identified by Robles were

12   sporadic and were not severe or pervasive.  Furthermore, Art. I, § 8 of the California Constitution

13   does not support isolated claims for harassment because harassment by itself does not disqualify a

14   person from entering or pursuing employment.

15       *Plaintiff's Opposition*

16       Robles argues that he was subject to severe and pervasive national origin harassment.

17   From the beginning to the end of February 2013, Campo called Robles a "stupid Mexican" almost

18   every day and said that he was "above all Mexicans" almost every day.  Also, Campo fired his

19   rifle in the direction of Robles and other Mexican workers.  Robles complained to Cervantes and

20   Barnum about Campo saying "stupid Mexican," but nothing was done.  The daily statements by

21   Campo create a triable issue of fact regarding national origin harassment.

22       *Discussion*

23       1.    California Constitution Art. I, § 8

24       A direct claim under Art. I, § 8 "may only be brought where a plaintiff has been denied

25   entrance into a profession or particular employment or terminated from the same."  Strother v.

26   Southern Cal. Permanente Med. Grp., 79 F.3d 859, 871 (9th Cir. 1996); Coleman v. Southern

27   Wine & Spirits of Cal., Inc., 2011 U.S. Dist. LEXIS 131173, *10 (N.D. Cal. Nov. 14, 2011);

28   Madison v. Motion Picture Set S Painters & Sign Writers Local 729, 132 F.Supp.2d 1244, 1255

(C.D. Cal. 2000).  Art. I, § 8 governs actions which result in the complete exclusion of an individual from employment with a particular employer, and does not reach conduct affecting particular aspects of an individual's job."  Strother, 79 F.3d at 872.  Here, Campo did not terminate Robles or deny him employment, nor did Campo have that authority.  Therefore, there is no viable Art. I, § 8 claim against Campo.  Summary judgment is appropriate.[14]  See Strother, 79 F.3d at 871-72; Coleman, 2011 U.S. Dist. LEXIS 131173 at *10.

    2.    FEHA

Robles's national origin harassment claim is based on three actions by Campo – almost daily calling Robles a "stupid Mexican," almost daily saying that he was "above all Mexicans," and the "rifle incident."

As to the rifle incident, the Court has addressed this matter in depth under the assault cause of action, *infra*.  In short, the evidence shows that Campo was shooting at coyotes, not at Robles or other Mexican workers, and Robles has provided no evidence that he saw Campo shooting in his direction or that undermines the assertion that Campo was shooting at coyotes only.  See Campo Dec. ¶ 5; Robles Depo. 115:1-20.  The evidence does not indicate that the "rifle incident" had anything to do with Robles's national origin.  Thus, it does not support a harassment claim.

With respect to being called a "stupid Mexican" on an almost daily basis, this assertion is based on Robles's declaration.  Robles expressly declared that "Campo said to me 'stupid Mexican' almost every day."  Robles Dec. ¶ 7.  However, at Robles's deposition, Robles testified in relevant part:

Q:    When did you hear Jay Payne use the words "stupid Mexican"?

**A:    When we're working in the spray and I make a mistake or they do something wrong the first thing they say, "this stupid Mexican," or things like that.**

Q:    You used the word "they."  Is there more than one person that said this?  Because you only identified Jay Payne.

**A:    Jay, Jay and all of them, including Lee, they have that habit of mistreating people and telling them "stupid Mexican."**

---

[14] The Court notes that Robles did not defend any of his claims under the California Constitution.  This is another basis for granting summary judgment.  See Ramirez v. City of Buena Park, 560 F.3d 1012, 1026 (9th Cir. 2009).

Q:     So your testimony is Jay Payne and Lee had the custom of calling employees "stupid Mexicans," is that what you're saying?

**A:     They have that habit of saying that word.  They mistreat you, and that's why I feel discriminated against and offended besides.**

Q:     My question was – I'm sorry, the words "stupid Mexican," you know, when was it said and who said it.  Right now you said Jay Payne said and Lee said, right?

**A:     Yes.**

Q:     Anybody else say that?

***A:     That I've heard it's just them.***

Robles Depo. 200:1-201:1 (emphasis added).

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  Yeager v. Bowlin, 693 F.3d 1076, 1080 (9th Cir. 2012); Van Asdale v. International Gaming Tech., 577 F.3d 989, 998 (9th Cir. 2009).  "In order to trigger the sham affidavit rule, the district court must make a factual determination that the contradiction is a sham, and the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit."  Yeager, 693 F.3d at 1080; see Van Asdale, 577 F.3d at 998-99.  "The non-moving party is not precluded from elaborating upon, explaining, or clarifying prior testimony elicited by opposing counsel on deposition and minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit."  Yeager, 693 F.3d at 1081; Van Asdale, 577 F.3d at 999.

Here, the deposition passage clearly indicates that Payne and "Lee" were the only people that Robles heard use the term "stupid Mexican."  Despite an express question that sought the identity of every individual who used the term "stupid Mexican," Robles did not identify Campo, let alone respond that he heard Campo use the term against him on an almost daily basis.  Now declaring that Campo used the term "stupid Mexican" on a daily basis contradicts Robles's deposition testimony.  Robles did not respond to Defendants' objection that Paragraph 7 of his declaration improperly contradicted the relevant deposition testimony.  Given the state of the evidence and absence of a response, the Court can only conclude that Paragraph 7 of Robles's

23

declaration is a sham.  As such, the Court strikes Paragraph 7 of Robles's declaration.[15]  See

Yeager, 693 F.3d at 1080; Van Asdale, 577 F.3d at 998-99.  Without Paragraph 7, Robles

identifies no basis for concluding that Campo said "stupid Mexican" almost daily.

With respect to Campo saying almost daily that he was "above all Mexicans," this is based

on Paragraph 8 of Robles's declaration.  Defendants object in part that the declaration is

misleading in light of the allegations in the Complaint and verified interrogatory responses.[16]

Interrogatory No. 8 asked for the identity of each person who harassed Robles and for a detailed

description of the harassment suffered.  See Doc. No. 54-2.  Robles responded to the interrogatory

by essentially copying the allegations in Paragraphs 9 and 10 of his complaint, which deal with

national origin and religion harassment respectively.  See Complaint ¶¶ 9, 10; Doc. No. 54-3.

Robles's interrogatory response with respect to national origin contains no assertion that Campo

said he was "above all Mexicans."  See Doc. No. 54-3.

The "sham declaration" rule applies to declarations that contradict not only prior

deposition testimony, but also prior sworn interrogatory responses.  See School Dist. No. 1 J,

Multnomah Cnty. v. ACandS, Inc., 5 F.3d 1255, 1264 (9th Cir. 1993); Reisner v. General Motors

Corp., 671 F.2d 91, 93 (2d Cir. 1982).  There is no place in Robles's interrogatory responses in

which Robles identified Campo as stating expressly that he was "above all Mexicans."  To

contend that Campo did say that he was "above all Mexicans" is contrary to Robles's verified

interrogatory responses, given the interrogatory's request for detailed information.  Robles did not

respond to Defendants' objection.  In the absence of a response, the Court concludes that

Paragraph 8 of Robles's declaration is a sham, and will strike it.  See Yeager, 693 F.3d at 1080;

School Dist. No. 1J, 5 F.3d at 1264; Reisner, 671 F.2d at 93.  Without Paragraph 8, Robles

---

[15] Robles also declared that he complained to Cervantes that Campo had said, "stupid Mexican," and Cervantes called Payne about the complaint.  See Robles Dec. ¶¶ 12, 13, 14.  These assertions are contrary to Pages 200 and 201 of Robles's deposition because Robles did not hear Campo say "stupid Mexican."  Therefore, the Court also strikes Paragraphs 12, 13 and 14 of Robles's declaration as a sham.  See Yeager, 693 F.3d at 1080.

[16] Defendants also object that Paragraph 8 contradicts Pages 360 and 361 of Robles's deposition.  However, Pages 360 and 361 deal with a conversation that Robles had with another foreman.  There are no questions on Pages 360 or 361 about what Campo said in general, or in particular whether Campo ever said that he was "above all the Mexicans."  Defendants have not shown that Robles's declaration is a "sham" compared with Pages 360 and 361 of Robles's deposition.  See Yeager, 693 F.3d at 1080 (". . . the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit.").

tttttt

1  identifies no basis for concluding that Campo said that he was "above all Mexicans" almost daily.

2  Alternatively, even if the Court considered Paragraph 8 of Robles declaration, it would not

3  create a genuine disputed issue of material fact.  It is true that Campo was a foreman over Robles,

4  and as a foreman, Campo's actions can be more impactful or harmful than those of a co-worker.

5  Cf. Roby, 47 Cal.4th at 706-07 (noting that harassment by high-level management can be more

6  damaging than harassment by a co-employee); Dee v. Vintage Petroleum, Inc., 106 Cal.App.4th

7  30, 36 (2003) (noting that harassment from a supervisor can cause a different result than

8  harassment from a non-supervisor).  Nevertheless, Campo did not use racial slurs.  Considering

9  Campo's position and that he is also a Mexican, see Campo Dec. ¶ 4, the words Campo used seem

10  to be in the nature of bragging or puffing himself up in front of the other workers.[17]  While

11  arrogant and offensive, Campo's words are not particularly severe.  Further, Campo worked with

12  Robles for a relatively short period of time, three weeks in February 2013.  Robles appears to have

13  worked under Campo for approximately 15 days.  See Doc. No. 45 at 8:11-13.  Of those 15 days,

14  Campo did not say that he was "above all Mexicans" daily (although it was almost daily).  One

15  comment by one person that occurred "almost daily" for a short period of time does not appear to

16  be particularly pervasive.  Considering the nature of Campo's remarks and the time to which

17  Robles would have been exposed, the evidence does not show that Campo's conduct was

18  sufficiently severe or pervasive such that it "would have interfered with a reasonable employee's

19  work performance and would have seriously affected the psychological well-being of a reasonable

20  employee . . . ." Aguilar v. Avis Rent A Car System, Inc., 21 Cal.4th 121, 130-31 (1999); Serri v.

21  Santa Clara University, 226 Cal.App.4th 830, 869-70 (2014); see also Lyle v. Warner Brothers

22  Television Prods., 38 Cal.4th 264, 282 (2006).

23  In sum, because the evidence does not show sufficiently severe or pervasive harassing

24  conduct because of national origin, summary judgment on this claim is appropriate.

25

26  [17] Membership in the same national origin can be considered in determining whether the totality of the circumstances demonstrate harassment or a hostile work environment.  See Ferguson v. Waffle House, Inc., 18 F.Supp.3d 705, 710-

27  11 (E.D. Va. 2014).  However, same membership is not determinative.  Members of the same race or national origin can harass each other because of race or national origin.  Ross v. Douglas County, 234 F.3d 391, 396 (8th Cir. 2000);

28  cf. Lewis v. City of Benicia, 224 Cal.App.4th 1519, 1525 (2014) (sexual harassment can occur between members of the same gender).

**C.**      **4th Cause of Action – FEHA & California Constitution– Religion Harassment**

*Defendant's Argument*

Campo argues that the religious harassment claim fails because his conduct was neither severe nor pervasive.  Harassment cannot be occasional, sporadic or trivial.  The religious comments identified by Robles are off-hand comments and isolated incidents of a generalized nature.  The conduct at issue was at most merely offensive.  A common sense view of the totality of the circumstances does not reveal actionable harassment.

*Plaintiff's Opposition*

Robles argues that he was severely and pervasively harassed by Campo because of religion.  Campo was a supervisor and would regularly make statements about the superiority of his religion and the inferiority of other religions.  Campo would make four such statements on an almost daily basis over a period of about 15 days.  Robles also argues that he was forced to participate in a Mormon prayer three times, once in the shop and twice in the field.  The prayers, combined with the 60 statements over a 15 day period, are sufficient to show severe or pervasive religion harassment.

*Legal Standard*

FEHA prohibits harassment of an employee.  Cal. Gov't Code § 12940(j).  "[H]arassment focuses on situations in which the social environment of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee."  Roby v. McKesson Corp., 47 Cal.4th 686, 706 (2009); Serri v. Santa Clara University, 226 Cal.App.4th 830, 869 (2014).  That is, "harassment refers to bias that is expressed or communicated through interpersonal relations in the workplace."  Roby, 47 Cal.4th at 707; Serri, 226 Cal.App.4th at 869.  Under FEHA, co-workers/employees are individually liable for their own harassing behavior. Cal. Gov. Code §§ 12940(j)(3); McClung v. Employment Development Dept., 34 Cal.4th 467, 471 (2004).  A workplace may give rise to liability when it is permeated with discriminatory intimidation, ridicule, and insult that are sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.  Lyle v. Warner Brothers Television Prods., 38 Cal.4th 264, 279 (2006); Mokler v.

1  County of Orange, 157 Cal.App.4th 121, 145 (2007).  However, FEHA is not a "civility code,"

2  and it does not outlaw course or vulgar conduct that merely offends.  Lyle, 38 Cal.4th at 291;

3  Mokler, 157 Cal.App.4th at 144.  To establish a claim for FEHA harassment, a plaintiff must

4  demonstrate that: (1) he is a member of a protected group; (2) he was subjected to harassment

5  because he belonged to this group; and (3) the alleged harassment was so severe or pervasive that

6  it created a hostile work environment.  See Lawler v. Montblanc N. Am., LLC, 704 F.3d 1235,

7  1244 (9th Cir. 2013).  Unless harassing conduct is "severe in the extreme," there is "no recovery

8  for harassment that is occasional, isolated, sporadic, or trivial."  Hughes v. Pair, 46 Cal.4th 1035,

9  1043 (2009); Lyle, 38 Cal.4th at 283.  Otherwise, there must be a "concerted pattern of harassment

10  of a repeated, routine or a generalized nature."  Aguilar v. Avis Rent A Car Sys., Inc., 21 Cal.4th

11  121, 130-31 (1999).  Further, to be actionable, an "objectionable environment must be both

12  objectively and subjectively offensive."  Hughes, 46 Cal.4th at 1044.  "The plaintiff must prove

13  that the defendant's conduct would have interfered with a reasonable employee's work

14  performance and would have seriously affected the psychological well-being of a reasonable

15  employee and that [he or she] was actually offended."  Serri v. Santa Clara University, 226

16  Cal.App.4th 830, 870 (2014); Rehmani v. Superior Court, 204 Cal.App.4th 945, 951-52 (2012).

17  Whether a "hostile work environment" exists can be determined by examining the totality of the

18  circumstances, including "the frequency of the discriminatory conduct, its severity, whether it is

19  physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

20  interferes with an employee's work performance."  Lyle, 38 Cal.4th at 282; Miller v. Department

21  of Corrections, 36 Cal.4th 446, 462 (2005).

22  _Discussion_

23  1.  California Constitution

24  Robles did not defend this claim.  As discussed above, Campo did not terminate Robles or

25  deny him employment.  Therefore, there is no viable Art. I, § 8 claim against Campo.  Summary

26  judgment is appropriate.  See Strother, 79 F.3d at 871-72; Coleman, 2011 U.S. Dist. LEXIS

27  131173 at *10; see also Ramirez v. City of Buena Park, 560 F.3d 1012, 1026 (9th Cir. 2009)

28  (holding that a failure to defend a claim on summary judgment is an abandonment of that claim).

27

1         **2.**       **FEHA**

2         The Court does not agree that Campo's conduct was insufficiently severe or pervasive.

3 First, Campo was more than a co-worker, he was Robles foreman and thus, a type of supervisor

4 who oversaw Robles's activities.  See PUMF's 2, 3, 5; Campo Dec. ¶ 2.  Campo's conduct is more

5 impactful because of his status as a Robles's foreman.  Cf. Roby, 47 Cal.4th at 706-07; Dee, 106

6 Cal.4th at 36.  Second, four comments have been identified by Robles: (1) "Your religion is

7 nothing, less than my religion;" (2) "I'm a better person than you guys because your religion is

8 less than my religion;" (3) "You are less than me.  I have a better job than you guys.  I'm a

9 Mormon and you guys are less than me;" and (4) "My religion is on top.  We are better than

10 anyone else."  PUMF's 74, 75, 76, 77.  These comments extol the superiority of Campo's religion

11 over all other religions, as well as Campo's superiority over non-Mormons such as Robles.  The

12 comments demean and belittle all people who are not members of the Mormon religion.  A

13 reasonable non-Mormon worker could be offended and impacted by these remarks, see Rehmani,

14 204 Cal.App.4th at 952, especially coming from one who is authorized to direct and supervise

15 work activity.  Third, and of critical import, the evidence indicates that Campo made these

16 statements to Robles and others nearly every day.  Robles argues that this totals around 60

17 statements that Robles heard Campo utter (4 comments a day for 15 days).  Approximately 60

18 statements that demeaned Robles and his religion over a three-week period is more than sporadic,

19 it is a pattern of routine conduct.  See Aguilar, 21 Cal.4th at 130-31.

20         Considering the nature and frequency of the comments, and the fact that Campo was

21 Robles's foreman, a reasonable jury could find that Campo's conduct was sufficiently pervasive to

22 create a hostile work environment based on religion.[18]  See Roby, 47 Cal.4th at 706-07; Lyle, 38

23 Cal.4th at 279, 282; Rehmani, 204 Cal.App.4th at 952; Dee, 106 Cal.4th at 36.  Summary

24 judgment on this claim is inappropriate.

---

[18] The Court notes that Robles declares that he was forced to pray three times while under Campo's supervision.  See Robles Dec. ¶ 21.  However, Robles testified at his deposition that one of the three times was when someone "big" in Agreserves talked to the workers about how well the company was doing.  See Robles Depo. 439:7-14.  It was that "big" individual who had the workers pray, not Campo.  See id.  Therefore, Campo was not responsible for forcing or requiring Robles to pray three times.  Because the Court finds that Campo's four statements a day to Robles over a 15 day period is sufficient to show harassment, the Court need not decide whether Paragraph 21 of Robles's declaration should be stricken as a sham.  See Yeager, 693 F.3d at 1080-81.

### D.      5th & 6th Causes of Action – Battery & Assault

*Defendant's Argument*

Campo argues that Robles's claims for battery and assault are preempted by California's workers' compensation law.  The alleged battery is based on the "car incident" when Campo gave Robles a ride between worksites and allegedly hit Robles's hand.  This was in connection with a discussion about meal and rest breaks.  The car incident was an interaction between employees during work hours, and was a normal part of the employment relationship.  Therefore, the battery claim is preempted.  With respect to the assault claim, this is based on the "rifle incident."  This incident involved an inherent risk with a farmland workplace, as vermin and wild animals are typical perils.  There is no dispute that Campo was using his rifle to fend off coyotes from the workplace.  Because this conduct was a normal part of an agricultural workplace, it is preempted by the workers' compensation laws.

*Plaintiff's Opposition*

Robles argues that he was battered when Campo hit him several times in the arm/hand, while Campo was driving a truck.  As Robles complained about not being given meal breaks, Campo punched the seat out of anger and while doing so, hit Robles's hand a few times.  Robles could not get out of the car and did not consent to being hit.  Robles argues he was assaulted when Campo was shooting at coyotes when Robles and other workers were in the same direction as the coyotes.  That coyotes were in the area does not justify Robles being placed in imminent apprehension of being shot.  Further, Robles was also placed in apprehension of a future battery when he was in the truck with Campo, after Campo was punching the seat.   These batteries and assaults exceed the normal business relationship.  The Legislature in 1982 expressly provided that the workers' compensation exclusivity does not apply when an employee's injuries are caused by a willful physical assault.  Because Campo's conduct was not a normal part of the business relationship, the workers' compensation laws do not apply.

*Legal Standards*

1.      Battery

A civil battery is "an offensive and intentional touching without the victim's consent."

1   Kaplan v. Mamelak, 162 Cal.App.4th 637, 645 (2008).  The elements of a civil battery under

2   California law are: (1) defendant touched plaintiff, or caused plaintiff to be touched, with the

3   intent to harm or offend plaintiff; (2) plaintiff did not consent to the touching; (3) plaintiff was

4   harmed or offended by defendant's conduct; and (4) a reasonable person in plaintiff's position

5   would have been offended by the touching.  So v. Shin, 212 Cal.App.4th 652, 669 (2013) (quoting

6   Judicial Council of Cal., Civil Jury Instructions ("CACI") § 1300); see also Fluharty v. Fluharty,

7   59 Cal.App.4th 484, 497 (2004).

8        2.    Assault

9        A civil assault is a "demonstration of an unlawful intent by one person to inflict immediate

10  injury on the person of another then present."  Steel v. City of San Diego, 726 F.Supp.2d 1172,

11  1189 (S.D. Cal. 2010).  Civil assault "recognizes the right of the individual to peace of mind, to

12  live without fear of personal harm."  Thing v. La Chusa, 48 Cal.3d 644, 649 (1989).  The elements

13  of a civil assault under California law are:  (1) defendant acted with intent to cause harmful or

14  offensive contact, or threatened to touch plaintiff in a harmful or offensive manner; (2) plaintiff

15  reasonably believed he was about to be touched in a harmful or offensive manner or it reasonably

16  appeared to plaintiff that defendant was about to carry out the threat; (3) plaintiff did not consent

17  to defendant's conduct; (4) plaintiff was harmed; and (5) defendant's conduct was a substantial

18  factor in causing plaintiff's harm.  So, 212 Cal.App.4th at 668-69 (quoting CACI § 1301).

19       *Discussion*

20       1.    Battery

21       It is not entirely clear that a battery occurred in this case.  Robles contends that he was

22  complaining to Campo about missing meal periods, which caused Campo to become upset.  See

23  Robles Depo. 123:9-23.  Campo "got crazy" and started hitting the middle of the seat.  Id. at

24  123:20-23.  Robles was leaning on his hand, and his hand was on/near the middle of the seat.  See

25  id. at 123:23.  Robles's hand was then struck 2 or 3 times by Campo.[19]  See id. at 123:23-25.  This

26  testimony suggests that Robles's hand was hit because it happened to be near the middle of the

27  seat, and Campo was hitting the seat out of frustration about Robles's complaints.  That is,

28
---
[19] Campo declared that he did not hit Robles.  See Campo Dec. ¶ 6.

1   Robles's testimony suggests that Campo accidently struck Robles's hand.[20]  See Robles Depo.

2   123:9-25.  If striking Robles was an accident, then there was no intent to harm or offend, and thus,

3   no actionable battery.  See So, 212 Cal.App.4th at 668.

4        Nevertheless, assuming that Robles was not accidently struck, Campo's conduct is covered

5   by the workers' compensation exclusivity law.  Campo and Robles were "on the clock" and

6   Campo was driving Robles to a different worksite.  Campo was Robles's foreman, and Robles was

7   complaining about Campo and others causing Robles to miss meal periods.  Complaining to a

8   foreman about missing meal periods, especially if related to the foreman's orders, is undeniably a

9   natural part of a working environment.  Campo responded in part by hitting the middle of the seat

10  and striking Robles's hand.  The two or three blows to the hand appear to be the type of "flare

11  ups" that are an inherent risk in the work environment.  See Torres, 26 Cal.4th at 1009; Jones, 152

12  Cal.App.4th at 1483.

13       Although "willful and unprovoked physical aggression" is an exception to workers'

14  compensation exclusivity, see Cal. Lab. Code § 3601(a)(1), the evidence does not reflect the

15  requisite intent to injure.  See Jones, 152 Cal.App.4th at 1383-84.  There is no indication that

16  Robles's hand was actually injured, there is not a detailed description of the nature of Campo's

17  blows, and, as discussed above, the testimony indicates an expression of frustration about Robles's

18  complaints.  The blows do not appear to have been serious or dangerous.  As such, the Court

19  cannot say that Robles's testimony is sufficient to show that Campo had the intent to injure

20  Robles.  Cf. id. at 1384 (finding assault and battery claims based on one worker grabbing another

21  by the arm and "banging her around" due to a dispute over use of a wheelbarrow were preempted).

22  Robles's battery claim against Campo is preempted by California's workers' compensation law.

23  Therefore, summary judgment on this claim is proper.  See id.

24       2.    Assault

25       With respect to the rifle incident, Robles did not see Campo fire the rifle, and there is no

26  indication that Robles actually saw where any shots landed.  See Robles Depo. 115:7-20.  Robles

27
─────────────────────
[20] Robles did not testify that Campo intentionally or consciously struck him.  See Robles Depo. 123:9-25.  Further,
28  although Robles submitted a declaration, his declaration does not mention the "car incident" with Campo.  See Doc.
No. 39.

1    only heard the gunshots and other workers said that Campo was shooting.  See id.  The workers

2    continued riding, and then Robles heard shooting "in front of the workers," and Robles then saw

3    coyotes running.  See id.  Campo declares that he was shooting at the coyotes and was not aiming

4    or shooting at anyone or anything other than the coyotes.  See Campo Dec. ¶ 5.  This evidence

5    does not show that Robles had the intent to put Robles in fear of an offensive or harmful touching.

6            Robles relies on his declaration, in which he states that Campo shot in the direction of the

7    farm workers.  See Robles Dec. ¶ 9.  However, as described above, Robles did not see Campo fire

8    the rifle, there is no indication that he saw where any shots landed, and Robles only heard the

9    shots and other workers told him that Campo was shooting.  See Robles Depo. 115:7-20.  If

10   Robles did not see Campo actually shooting or where the shots landed, but relied on other

11   employees to explain the situation, then Robles did not actually know in which direction Campo

12   was firing.  Furthermore, even if the workers were in the direction of the coyotes, that alone does

13   not show that Campo had the intent to place Robles in fear of a harmful touching.  There is no

14   dispute that coyotes and other vermin pose a hazard to the farm and to farm workers, see id. at

15   116:16-117:15; Campo Dec. ¶ 5.  The known danger posed by coyotes, combined with the fact

16   that the coyotes were running away from Robles, see Robles Depo. 115:17-20, support Campo's

17   claim that he was only aiming and shooting at the coyotes.  That Robles and the other workers

18   were all Mexican does nothing to cast doubt on Campo's declaration.  Cf. McDonald v. Coldwell

19   Banker, 543 F.3d 498, 504 n.4 (9th Cir. 2008) (rejecting a position that would create a *prima facie*

20   case of discrimination whenever the relevant parties are of a different race); Ricks v. United Air

21   Lines, Inc., 2013 U.S. Dist. LEXIS 34903, *44 (N.D. Cal. Mar. 13, 2013) (finding that a bare

22   assertion that employees are of a different race is insufficient to show a discriminatory motive).

23   At best, the evidence suggests negligence, but it does not show that Campo had the necessary

24   intent to cause or threaten a harmful or offensive touching.  So, 212 Cal.App.4th at 668-69.

25           Alternatively, Robles does not dispute that coyotes and other vermin pose a danger to

26   farmland and farm workers.  See Robles Depo. 116:16-117:15.  Efforts to eradicate or minimize

27   those dangers would appear to be something that an agriculture employer would do.  See id. at

28   117:7-15.  Consequently, agriculture employees could expect to be around not only coyotes and

vermin, but also the efforts to control or remove those animals.  Campo was trying to drive away the coyotes away when he fired the shots.  See Campo ¶ 5.  Without more from Robles, the evidence presented suggests that Campo's rifle fire was within the scope of his employment because it was either a risk inherent in that workplace or was broadly incidental to Agreserves's enterprise.  Torres, 26 Cal.4th at 1008; Campo Dec. ¶ 5; Robles Depo. 116:16-117:15.  Therefore, this claim is preempted by the workers' compensation law.[21]  See id.

With respect to the car incident, this claim is also preempted by the workers' compensation law.  Any apprehension of a harmful touching was the result of Campo's conduct after he heard Robles complaining.  A loud and animated response from a foreman is clearly a risk inherent in employment.  See Torres, 26 Cal.4th at 1009 (noting that emotional flare-ups are expressions of human nature and "incidents inseparable from [people] working together."); Cole v. Fair Oaks Fire Protection Dist., 43 Cal.3d 148, 160 (1987) (holding that claims based on inter alia negotiations as to grievances are covered by workers' compensation).  Because this claim is preempted by the workers' compensation law, summary judgment is appropriate.  See id.

### E.      11th Cause of Action – Labor Code § 558

*Parties' Arguments*

Campo argues that summary judgment is appropriate because Labor Code § 558 provides for civil penalties, but does not create a private cause of action.  Robles does not defend this claim.

*Discussion*

Labor Code § 558 provides for civil penalties against any employer or person acting on behalf of an employer who violates various provisions of the Labor Code.  See Cal. Lab. Code § 558.  Federal courts in California have held that there is no private cause of action created by Labor Code § 558.[22]  See  Renazco v. Unisys Tech. Servs., L.L.C., 2014 U.S. Dist. LEXIS 168922, *7 (N.D. Cal. Dec. 5, 2014); Morales v. Compass Group, PLC, 2014 U.S. Dist. LEXIS

---

[21] As discussed above, there is insufficient evidence to contradict Campo's declaration that he was shooting at coyotes to drive them away from the farmland.  See Campo Dec. ¶ 5.  As such, there is also no evidence that Campo acted with the intent to injure Robles.  See Cal. Lab. Code § 3601(a)(1); Jones, 152 Cal.App.4th at 1383-84.

[22] The Court notes that an aggrieved employee can recover the penalties  of Labor Code § 558, but he must utilize the procedures of Labor Code § 2699.3.  See Chang v. Biosuccess Biotech Co., Ltd., 76 F.Supp.3d 1022, 1049-50 (C.D. Cal. 2014).

1    150114, *24 (C.D. Cal. Oct. 16, 2014); Chand v. Burlington Coat Factory of Cal., LLC, 2014 U.S.

2    Dist. LEXIS 22985, *30 (E.D. Cal. Feb. 24, 2014); Ruiz v. Paladin Group, Inc., 2003 U.S. Dist.

3    LEXIS 27872, *4-*7 (C.D. Cal. Sept. 29, 2003).  In the absence of an opposition, summary

4    judgment on this claim is appropriate.  See Ramirez, 560 F.3d at 1026 (failure to defend a claim

5    on summary judgment is an abandonment of that claim); Renazco, 2014 U.S. Dist. LEXIS 168922

6    at *7; Chand, 2014 U.S. Dist. LEXIS 2985 at *30.

7         **G.      15th Cause of Action – False Imprisonment**

8         *Parties' Arguments*

9         Campo argues that there is a one year statute of limitations for false imprisonment.

10   Because any false imprisonment occurred on February 11, 2013, and the complaint was not filed

11   until February 27, 2014, Robles's claim is time barred.  Robles does not respond to this argument.

12        *Discussion*

13        Campo is correct.  There is a one year statute of limitations for false imprisonment claims.

14   See Cal. Code Civ. P. § 340(c); Thompson v. City of Shasta Lake, 314 F.Supp.2d 1017, 1023

15   (E.D. Cal. 2004).  There is no dispute from Robles that any false imprisonment by Campo

16   occurred prior to February 27, 2013.  See DUMF 39.  In the absence of any opposition, the Court

17   can only conclude that Robles's claim is barred by the applicable one-year statute of limitations.

18   See Ramirez, 560 F.3d at 1026; Cal. Code Civ. P. § 340(c).

19        **H.      16th Cause of Action – Intentional Infliction of Emotional Distress ("IIED")**

20        *Defendant's Argument*

21        Campo argues Robles's IIED claim is based on the battery, assault, false imprisonment,

22   and harassment claims.   Because the battery and assault claims are barred by workers'

23   compensation exclusivity, so too is the dependent IIED claim.  Robles's false imprisonment claim

24   is time barred, and, in any event, not being allowed to exit the car until it arrived at the next

25   worksite is an example of a normal risk stemming from the employment relationship.  Therefore,

26   the IIED claim based on false imprisonment is barred by workers' compensation exclusivity.  As

27   for harassment, Robles has no claim because Campo did not engage in either severe or pervasive

28   harassment.  Further, as an individual, Campo cannot have a "discriminatory practice" and cannot

be held liable individually liable for FEHA discrimination.  Because Campo cannot have a discriminatory practice, all other alleged workplace misconduct by him is covered by workers' compensation.  For the same reasons that discrimination and retaliation claims must be brought against an employer only, IIED claims should not be maintained against individuals based on workplace misconduct.

Campo also argues Robles cannot meet three essential elements of an IIED claim.  First, none of the acts relied upon by Robles were sufficiently outrageous to support an IIED claim.  At worst Campo's statements were offensive or insensitive.  Second, Campo argues that there is no credible evidence that Robles suffered severe emotional distress.  Following an agreed upon court-ordered exam, expert Dr. Kania opined that Robles did not sustain severe emotional distress.  Finally, there is no evidence that Campo intended to cause Robles emotional harm.

*Plaintiff's Opposition*

Robles argues that summary judgment should not be granted.  With respect to workers' compensation, exclusivity does not apply when injuries are caused by a willful physical assault, such as the conduct by Campo.  Furthermore, assault, battery, harassment, and IIED based thereon have no proper places in the normal employment relationship.

With respect to the elements of IIED, first, Campo's conduct was outrageous.  Campo's national origin and religion harassment violated public policy, and a jury could find that Campo's assault and battery were outrageous.  Furthermore, a reasonable jury could find Campo abused his position over Robles, knew that Robles was susceptible to mental distress injuries, or acted intentionally with the knowledge that emotional distress would likely result.  Second, there is sufficient evidence to show severe emotional distress was experienced.  After Campo's harassment, Robles suffered constant nightmares, lethargy, and muscle pain.  Campo was always biting his lip, and felt anxiety and panic.  After his termination, Campo was remembering all of his experiences at Agreserves and began isolating himself.  He was treated professionally for mental injuries and is on anti-depressants to help prevent anxiety attacks.

*Discussion*

The Court accepts that Robles's IIED claim is tethered to his claims for battery, assault,

1   false imprisonment, national origin harassment, and religion harassment.  The Court will address

2   each basis for an IIED claim separately.

3       1.      IIED Based On Assault, Battery, & National Origin Harassment

4       The Court has found that there was a failure of essential elements with respect to assault

5   and national origin harassment, and that the assault and battery claims were preempted by the

6   workers' compensation law.  For the reasons that these claims failed, an IIED claim based on

7   those claims also fail.  Summary judgment for Robles's IIED claims based assault, battery, and

8   national origin harassment is appropriate.

9       2.      IIED Based On False Imprisonment

10      Robles contends that he was falsely imprisoned during the "car incident."  While driving

11  between worksites, Robles requested that Campo stop the vehicle and let him out, but Campo

12  refused until they reached the desired worksite.  See DUMF 38; PUMF 88.  Campo is not liable

13  for false imprisonment because of the one-year statute of limitations.  However, the statute of

14  limitations for an IIED claim is two years.  See Cal. Code Civ. P. § 335.1; Pugliese v. Superior

15  Ct., 146 Cal.App.4th 1444, 1450 (2007).  Campo does not cite any authority or expressly argue

16  that the one-year limitations period should apply to an IIED claim that is based on facts that would

17  also constitute a false imprisonment.  Because there is no dispute that Robles fits within the two-

18  year limitations period for IIED claims, the grant of summary judgment on the false imprisonment

19  claim does not defeat Robles's IIED claim.

20      Nevertheless, Campo's act of refusing to stop the car until they reached the worksite is not

21  sufficiently outrageous as a matter of law.  The car ride lasted an additional 15 minutes from the

22  time that Campo refused to stop.  See DUMF 38; PUMF 88.  Robles appears to have made it to

23  the worksite, and there is no indication that he was somehow unable to keep working as a result of

24  the car ride.  Having to endure a 15 minute car ride to the next worksite is not so "extreme and

25  outrageous" that it "exceed[ed] all bounds of that usually tolerated in a civilized community."

26  Hughes, 46 Cal.4th at 1050; Potter, 6 Cal.4th at 1001.  To the extent that Robles relies on

27  Robinson and Agarwal, he has not explained how those cases actually apply to this case.  As the

28  evidence stands, Agarwal's criteria are not met.  See Agarwal, 25 Cal.3d at 1130.  First, driving to

36

1   the worksite does not appear to be an abuse of power or an act that would damage Robles's

2   interests.  Second, there is no evidence that Campo knew Robles was particularly susceptible to

3   mental distress.  Third, there is nothing to suggest that Campo intentionally acted with a

4   recognition that continuing to drive would likely result in illness through mental distress.  Thus,

5   summary judgment on Robles's IIED claim based on false imprisonment is appropriate.

6          3.     IIED Based on Religion Harassment

7         Campo makes five arguments against Robles's IIED claim.  First, Campo argues that his

8   conduct was not "outrageous."  However, as discussed above, a reasonable jury could find in favor

9   of Robles on his claim of religion harassment.  FEHA harassment "in the work place is outrageous

10  conduct as it exceeds all bounds of decency usually tolerated by a decent society;" thus,

11  "harassment will constitute the outrageous behavior element required of a cause of action for

12  [IIED]."  Murray v. Oceanside Unif. Sch. Dist., 79 Cal.App.4th 1338, 1362-63 (2000); Fisher v.

13  San Pedro Peninsula Hosp., 214 Cal.App.3d 590, 618 (1989).  Because Robles has a viable

14  religion harassment claim, he has presented conduct that is sufficiently outrageous for purposes of

15  IIED.  See Murray, 79 Cal.App.4th at 1362-63; Fisher, 214 Cal.App.3d at 618.

16        Second, Campo argues that this IIED claim is barred by the workers' compensation

17  exclusivity rule.  However, neither discrimination nor harassment under FEHA is a normal

18  incident of employment.  See Nazir v. United Airlines, Inc., 178 Cal.App.4th 243, 286 (2009);

19  Murray, 79 Cal.App.4th at 1363; Accardi v. Superior Ct., 17 Cal.App.4th 341, 352 (1993).

20  Therefore, IIED claims that are based on FEHA harassment are not preempted by California's

21  workers' compensation laws.  See Nazir, 178 Cal.App.4th at 286; Murray, 79 Cal.App.4th at

22  1363; Accardi, 17 Cal.App.4th at 352.  Because Robles has a viable religion harassment claim, his

23  IIED cause of action based on religion harassment is not barred by workers' compensation

24  exclusivity.  See Nazir, 178 Cal.App.4th at 286; Murray, 79 Cal.App.4th at 1363.

25        Third, relying on *Jones v. The Lodge at Torrey Pines Partnership*, 42 Cal.4th 1158 (2008),

26  Campo argues that he should not be held individually liable for IIED because individuals cannot

27  have a "discriminatory practice" or be held liable for FEHA discrimination.  *Jones* held that

28  individuals cannot be held liable for retaliation under FEHA § 12940(h), and relied on the

1  reasoning of *Reno v. Baird*, 18 Cal.4th 640 (1998), a case which held that individuals cannot be

2  liable for discrimination under FEHA § 12940(a).  See Jones, 42 Cal.4th at 1160, 1164.  The

3  problem for Campo is that Robles's IIED claim is not based on conduct implicating either

4  discrimination under § 12940(a) or retaliation under § 12940(h).  Rather, the conduct involved

5  implicates harassment under FEHA § 12940(j).  There is a distinction between FEHA

6  discrimination and retaliation on the one hand, and FEHA harassment on the other.  See Jones, 42

7  Cal.4th at 1162, 1167-68; Reno, 18 Cal.4th at 644-45.  Individual employees such as Campo are

8  liable for their workplace harassment, per FEHA § 12940(j)(3).  See Jones, 42 Cal.4th at 1162;

9  McClung, 34 Cal.4th at 471.  Campo cites no authority that directly supports his position, does not

10  even cite § 12940(j) (3), and does not adequately explain why concepts from § 12940(a) and §

11  12940(h) should be imported into an IIED claim that is based on § 12940(j)(3).  Because §

12  12940(j)(3) expressly provides for individual liability, there is no reason apparent why an IIED

13  claim based on FEHA harassment cannot be made against an individual employee.

14      Fourth, relying on a declaration that states he did not intend to cause Robles emotion

15  distress, see Campo Dec. ¶ 7, Campo argues that he did not act with the intent necessary for an

16  IIED claim.  A reasonable trier of fact could believe Campo.  However, there is sufficient

17  circumstantial evidence that Campo acted with the necessary intent.  As discussed above, Campo's

18  comments demeaned non-Mormon religions and non-Mormons alike.  Campo's comments convey

19  the message that he is superior because of his religion and that non-Mormons like Robles are

20  inferior.  The approximately 60 times that Campo made such comments over a period of 15 days

21  indicate that Campo wanted to be sure that others, like Robles, got the message about Campo's

22  personal and religious superiority.  Given this volume, it is perfectly reasonable to infer that

23  Campo intended to adversely affect others.  Therefore, a reasonable trier of fact could view the

24  harassment and comments attributed to Campo and conclude that, at a minimum, he acted in

25  reckless disregard of a probability of causing emotional distress.  See Hughes, 46 Cal.4th at 1050-

26  51.  Where more than one reasonable inference is possible, summary judgment is not proper.  See

27  Fresno Motors, 771 F.3d at 1125; Holly D., 339 F.3d at 1175.

28      Finally, Campo argues that there is insufficient evidence of severe emotional distress.

Severe emotional distress may consist of shock, horror, nausea, fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, or worry, but the condition must be severe and cannot be trivial or transient.  See Bikkina v. Mahadevan, 241 Cal.App.4th 70, 88 (2015); Fletcher v. Western Nat'l Life Ins. Co., 10 Cal.App.3d 376, 397 (1970).  Campo's argument is based on the opinions of Dr. Kania, who examined Robles as part of Federal Rule of Civil Procedure 35 mental examination.  Dr. Kania opined that Robles did not suffer severe emotional distress.  See DUMF 59.  In contrast, Robles has declared that he suffered anxiety, depression, physical pain, lethargy, isolation, and nightmares because of Campo's harassment.  See PUMF 162-166.  Robles also has sought mental healthcare, and he currently takes anti-depressants for anxiety.  See PUMF 167-168.  Robles' testimony indicates that he has suffered "severe emotional distress."  The credibility of witnesses (both lay and expert) and the weight to be given the evidence are issues for the trier of fact.  See City of Pomona v. SQM N. Am. Corp., 750 F.3d 1036, 1047 (9th Cir. 2014); Guy v. City of San Diego, 608 F.3d 582, 585 (9th Cir. 2010).  Therefore, the jury will evaluate the conclusions and credibility of Dr. Kania, as well as the testimony and credibility of Robles, in order to determine whether severe emotional distress exists.  See Plotnik v. Meihaus, 208 Cal.App.4th 1590, 1614 (2012) (holding that the court determines whether severe emotional distress can be found, but the jury determines whether severe emotional distress exists)); Fletcher, 10 Cal.App.3d at 397.  Although a jury ultimately *may* accept Dr. Kania's opinions, the Court is aware of no authority that would *require* a jury to accept Dr. Kania's opinions.

In sum, Robles has adduced sufficient evidence to support a claim of IIED based on religion harassment.  None of Campo's arguments against that claim are availing.  Therefore, summary judgment on the IIED claim based on religion harassment is inappropriate.

## III.   AGRESERVES'S MOTION

### A.   1st Cause of Action – Title VII – National Origin Harassment, Discrimination, & Retaliation

*Defendant's Argument*

Agreserves argues that Roles cannot make out a *prima facie* case of discrimination because

1   there is no evidence that non-Mexicans were treated more favorably, nor is there evidence that

2   Robles was terminated because of his Mexican national origin.  However, even if Robles can

3   make a prima facie case, Robles was terminated for legitimate non-discriminatory reasons.  Payne

4   conducted an independent investigation.  Based on this investigation and his own observations of

5   Robles, Payne decided to terminate Robles for insubordination, dishonesty, refusal to cooperate,

6   and failure to follow safety practices.  Moreover, Payne did not know that Robles was Mexican.

7   Prior to the termination, Payne had no knowledge of complaints by Robles or harassing conduct

8   against Robles. There is no evidence that the business reasons for terminating Robles were pretext.

9   *Plaintiff's Opposition*

10   Robles argues that summary judgment is improper.  Campo was Robles's supervisor and

11   made disparaging remarks about Mexicans on an almost daily basis.  Payne made the decision to

12   terminate Robles, and Payne considered and was influenced by a negative report by Campo.  That

13   is, Payne acted as Campo's "cat's paw."  Furthermore, Payne said "fucking Mexicans" three times

14   when referring to Robles, and refused to do anything when Cervantes reported that Campo was

15   saying "stupid Mexican," which constitutes ratification.  This evidence shows racial animus by

16   Payne and Campo, and that animus is attributable to Agreserves.

17   *Legal Standards*

18   1.   Discrimination

19   Title VII prohibits an employer from discriminating against an employee based on *inter*

20   *alia* religion and national origin.  See 42 U.S.C. § 2000e-2(a); Alaska v. EEOC, 564 F.3d 1062,

21   1087 (9th Cir. 2009).  When a plaintiff alleging discrimination opposes summary judgment, he

22   "may proceed by using the *McDonnell Douglas* framework,[23] or alternatively, may simply

23   produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely

---

[23] Under the *McDonnell Douglas* burden shifting framework, the plaintiff first must establish a *prima facie* case of
discrimination.  Sanders v. City of Newport, 657 F.3d 772, 777 n.3 (9th Cir. 2011).  To establish a prima facie case
under Title VII, a plaintiff must offer proof: (1) that the plaintiff belongs to a class of persons protected by Title VII;
(2) that the plaintiff performed his or her job satisfactorily; (3) that the plaintiff suffered an adverse employment
action; and (4) that the plaintiff's employer treated the plaintiff differently than a similarly situated employee who
does not belong to the same protected class as the plaintiff.  Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018,
1028 (9th Cir. 2006).  If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate
a legitimate, nondiscriminatory reason for the adverse employment action.  Sanders, 657 F.3d at 777 n.3.  If the
employer articulates a legitimate reason for its action, the plaintiff must then show that the reason given is pretext.  Id.

1    than not motivated [the defendant]." Metoyer v. Chassman, 504 F.3d 919, 931 (9th Cir. 2007);

2    McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1122 (9th Cir. 2004).  Direct evidence is "evidence,

3    which, if believed, proves the fact [of discriminatory animus] without inference or presumption"

4    and "typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by

5    the employer." Dominguez-Curry v. Nev. Transp. Dep't, 424 F.3d 1027, 1038 (9th Cir. 2005).

6    The direct evidence produced need not be substantial; "very little direct evidence of the employer's

7    discriminatory intent [is needed] to move past summary judgment." Chuang v. University of Cal.

8    Davis, 225 F.3d 1115, 1128 (9th Cir. 2000).  The Ninth Circuit has held "that a single

9    discriminatory comment by a plaintiff's . . . decisionmaker is sufficient to preclude summary

10   judgment for the employer." Davis v. Team Elec. Co., 520 F.3d 1080, 1092 (9th Cir. Or. 2008);

11   Dominguez-Curry, 424 F.3d at 1039; see also Chuang, 225 F.3d at 1128; Cordova v. State Farm

12   Ins., 124 F.3d 1145, 1149-50 (9th Cir. 1997).

13           2.      Retaliation

14           Title VII prohibits, among other things, retaliation against an employee for making a

15   charge or otherwise participating in a Title VII proceeding.  Nilsson v. City of Mesa, 503 F.3d

16   947, 953 (9th Cir. 2007).  A plaintiff makes a prima facie case of retaliation by demonstrating that:

17   (1) he engaged in protected activity; (2) he suffered an adverse action; and (3) that there was a

18   causal link between the two.  T.B. v. San Diego Unified Sch. Dist., 806 F.3d 451, 473 (9th Cir.

19   2015); Westendorf v. West Coast Contrs. of Nev., Inc., 712 F.3d 417, 422 (9th Cir. 2013).  "An

20   employee engages in protected activity when she opposes an employment practice that either

21   violates Title VII or that the employee reasonably believes violates that law." Westendorf, 712

22   F.3d at 422.  The standard for the "causal link" is "but-for causation." T.B., 806 F.3d at 473.  The

23   plaintiff "must make some showing sufficient for a reasonable trier of fact to infer that the

24   defendant was aware that the plaintiff had engaged in protected activity." Raad v. Fairbanks N.

25   Star Borough, 323 F.3d 1185, 1197 (9th Cir. 2003).

26           *Discussion*

27           1.      Harassment

28           This claim is based on the actions of Campo.  The standards for harassment under FEHA

41

1   and Title VII are essentially the same.  See Davis v. Cal. Dept. of Corr. & Rehab., 484 Fed. Appx.

2   124, 127 n.3 (9th Cir. 2012) (citing Brooks v. City of San Mateo, 229 F.3d 917, 923 (9th Cir.

3   2000)); Lyle, 38 Cal.4th at 279.  As discussed above, the evidence does not show that Campo's

4   conduct was sufficiently severe or pervasive, such that it would have interfered with a reasonable

5   employee's work performance and seriously affected the employee's psychological well-being.

6   Therefore, summary judgment in favor Agreserves on this claim is appropriate.  See Harris v.

7   Maricopa Cty. Sup. Ct., 631 F.3d 963, 977 (9th Cir. 2011); Davis, 484 Fed. Appx. at 127-28.

8        2.    Discrimination

9        Agreserves relies on the *McDonnel Douglas* burden shifting framework in arguing for

10  summary judgment.  However, in this case, *McDonnel Douglas* is not necessary as Robles has

11  direct evidence of discriminatory animus.  See Metoyer, 504 F.3d at 931.  There is no dispute that

12  Payne was the decisionmaker who terminated Robles.  Although disputed by Payne, Robles has

13  produced evidence that Payne on several occasions used the term "stupid Mexican" and at least

14  three occasions said "fucking Mexican" when referring to Robles.  See PUMF 23; Robles Depo.

15  200:2-11.  These are clearly bigoted statements (the latter especially), and they are direct evidence

16  of national origin animus.  See Dominguez-Curry, 424 F.3d at 1038-39; Cordova, 124 F.3d at

17  1149-50 (finding summary judgment improper when decisionmaker used the bigoted term "dumb

18  Mexican").  Payne's statements are sufficient to raise a triable issue of material fact as to national

19  origin animus.  See Davis, 520 F.3d at 1092; Dominguez-Curry, 424 F.3d at 1039; Cordova, 124

20  F.3d at 1149-50; see also Metoyer, 504 F.3d at 931.

21       Agreserves has pointed to non-discriminatory reasons for termination, an independent

22  investigation by Payne, and the fact that Payne hired Robles.  There is no doubt that the proffered

23  reasons for the termination are non-discriminatory and if true, would not violate Title VII.

24  Further, the Ninth Circuit has recognized that:  (1) there is a strong inference against

25  discrimination when, within a short period of time, the actor who terminated an employee is the

26  same actor who hired the employee, see Schechner v. KPIX-TV & CBS Broad., Inc., 686 F.3d

27  1010, 1026 (9th Cir. 2012); Coghlan v. American Seafoods Co., 413 F.3d 1090, 1098 (9th Cir.

28  2005), and; (2) when an employer conducts an independent investigation, the nexus between an

42

adverse action and a subordinate's discriminatory motive is missing, see Poland v. Chertoff, 494 F.3d 1174, 1183 (9th Cir. 2007) (finding that a "cat's paw" theory can be negated by "an entirely independent investigation by the employer"); see also Lakeside-Scott v. Multnomah Cnty., 556 F.3d 797, 804-06 (9th Cir. 2008) (analyzing causation in a First Amendment claim under 42 U.S.C. § 1983).  However, these considerations are not sufficient to negate Payne's blatantly discriminatory words.

Payne was the decision-maker, and his discriminatory words call into question the true independence of his investigation, as well as the veracity of any non-discriminatory reasons that he may give for the termination.  See Cordova, 124 F.3d at 1149-50.  To be sure, the fact that Payne made the decision to hire Robles is a consideration that clearly weighs in favor of Agreserves.  See Schechner, 686 F.3d at 1026; Coghlan, 413 F.3d at 1096-97.  Nevertheless, the "same actor" inference is not absolute and a sufficiently strong showing of discrimination may negate it.  See Coghlan, 413 F.3d at 1097.  The Court finds that a jury could view Payne's referring to Robles as a "stupid Mexican" and at least three times as a "fucking Mexican," as being sufficiently strong.  Cf. Cordova, 124 F.3d at 1149.  Given the conflicting inferences that are possible through Payne's discriminatory words and his status as the "same actor," summary judgment cannot be granted.  See Fresno Motors, 771 F.3d at 1125; Holly D., 339 F.3d at 1175.

Summary judgment on this claim is improper.  See Fresno Motors, 771 F.3d at 1125; Dominguez-Curry, 424 F.3d at 1038-39; Cordova, 124 F.3d at 1149.

3.      Retaliation

Robles identifies two protected activities.  First, through PUMF 25, Robles contends that he complained to Payne during the March 28 meeting about Payne using the term "fucking Mexican."  See PUMF 25.  PUMF 25 is based on deposition testimony from Robles.  However, as Agreserves correctly points out, none of the cited deposition testimony shows that Robles made a complaint to Payne about Payne saying "fucking Mexican," or any other derogatory comment about Mexicans.  Therefore, PUMF 25 is not established, and Robles has not shown that he engaged in "protected activity" by complaining about Payne's language towards Mexicans.  See Westendorf, 712 F.3d at 422.

Second, Robles contends that he complained to Cervantes about racial comments made by Campo, and Cervantes informed Payne. However, this argument is based on Paragraphs 12, 13 and 14 of Robles's declaration. As discussed above, the Court has stricken Paragraphs 12, 13 and 14 because they irreconcilably contradict Robles's deposition, wherein Robles testified that Payne and "Lee" were the only people Robles heard use the phrase "stupid Mexican." Without Paragraphs 12, 13, and 14, there is no evidence that Robles opposed an employment practice that violates Title VII. See Westendorf, 712 F.3d at 422.

Because Robles has not demonstrated that he engaged in protected activity, summary judgment on this claim is appropriate.

### B.   2nd Cause of Action – Title VII – Religion Harassment, Discrimination, & Retaliation

*Defendant's Argument*

Agreserves argues that Robles cannot make out a *prima facie* case of discrimination because there is no evidence that non-Mexicans were treated more favorably, nor is there evidence that Robles was terminated because of his Mexican national origin. However, even if Robles can make a prima facie case, Robles was terminated for legitimate non-discriminatory reasons. Payne conducted an independent investigation. Based on this investigation and his own observations of Robles, Payne decided to terminate Robles for insubordination, dishonesty, refusal to cooperate, and failure to follow safety practices. Moreover, Payne did not know that Robles was Mexican. Prior to the termination, Payne had no knowledge of any complaints by Robles or any allegedly harassing conduct against Robles. There is no evidence that the legitimate business reasons for terminating Robles are pretext.

*Plaintiff's Opposition*

Robles argues that summary judgment is inappropriate. Campo was Robles's supervisor and made offensive remarks about non-Mormons and his own superiority as a Mormon on an almost daily basis. Payne made the decision to terminate Robles, and Payne considered and was influence by a negative report by Campo. That is, Payne acted as Campo's "cat's paw." Robles complained Furthermore, and Payne said "fucking Mexicans" three times when referring to

Robles, and refused to do anything when Cervantes reported that Campo was saying "stupid Mexican," which constitutes ratification. This evidence shows racial animus by Payne and Campo, and that animus is attributable to Agreserves.

*Discussion*

1.     Harassment

This cause of action is based on the actions of Campo. The standards for harassment under FEHA and Title VII are essentially the same. See Davis, 484 Fed. Appx. at 127 n.3 (citing Brooks, 229 F.3d at 923); Lyle, 38 Cal.4th at 279. As discussed above, there is sufficient evidence to establish that Campo's conduct was sufficiently severe or pervasive, such that it would have interfered with a reasonable employee's work performance and seriously affected the employee's psychological well-being. However, the mere fact that harassment occurred is not necessarily sufficient to impose liability against an employer. An employer's liability under Title VII for harassment generally depends on whether the harasser is a co-worker or a supervisor. See Vance v. Ball State Univ., 133 S.Ct. 2434, 2439 (2013); Swinton v. Potomac Corp., 270 F.3d 794, 803 (9th Cir. 2001).

a.     Acts of a Supervisor

Campo was a foreman, and as a foreman he "oversaw" field workers. See Campo Dec. ¶¶ 2, 3. The Court takes this to mean that Campo would ensure that workers were performing their job assignments property or generally directed a worker's daily job activities. See PUMF's 2, 3, 5. A "supervisor" for purposes of Title VII entails more than someone who generally directs daily work activities or ensures proper performance. A "supervisor" under Title VII is one who has been empowered by the employer to "take tangible employment actions against the victim, i.e. to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Vance, 133 S.Ct. at 2443. The evidence is undisputed that Campo did not have the ability to take any of these "tangible employment actions" against Robles. See Campo Dec. ¶ 2; Payne Dec. ¶ 5. Therefore, there is no Title VII liability under a "supervisor" theory. See Vance, 133 S.Ct. at 2443.

1                <u>b.</u>     <u>Acts of a Co-Worker</u>

2       An employer may be liable for harassment by a co-worker if the employer "knows or

3 should know of the harassment but fails to take steps reasonably calculated to end the

4 harassment." <u>Dawson v. Entek, Int'l</u>, 630 F.3d 928, 938 (9th Cir. 2011). "Once an employer

5 knows or should know of harassment, a remedial obligation kicks in." <u>Nichols</u>, 256 F.3d 864, 875

6 (9th Cir. 2001); <u>Fuller v. City of Oakland</u>, 47 F.3d 1522, 1528 (9th Cir. 1994). An employer is

7 under an obligation to take prompt effective steps that will end current harassment and deter future

8 harassment by the harasser or others. <u>See</u> <u>Nichols</u>, 256 F.3d at 875; <u>Fuller</u>, 47 F.3d at 1528. If the

9 employer undertakes no remedy, "liability attaches for both the past harassment and any future

10 harassment." <u>Nichols</u>, 256 F.3d at 875-76. That harassment may have independently ceased does

11 not excuse an employer's inaction. <u>Dawson</u>, 630 F.3d at 941. Because Title VII condemns the

12 existence of past harassment, employers have a "duty to express strong disapproval of . . .

13 harassment, and to develop appropriate sanctions." <u>Fuller</u>, 47 F.3d at 1529. "Title VII does not

14 permit employers to stand idly by once they learn that sexual harassment has occurred. To do so

15 amounts to a ratification of the prior harassment." <u>Id.</u>

16       Here, Robles did not complain to anyone about Campo's conduct while he worked under

17 Campo, and there is no evidence that Agreserves should have known about Campo's conduct

18 during that time. However, after Robles left Campo's work crew at the end of February 2013,

19 Robles testified that he complained to Barnum that "Campo talked about religious stuff that [he]

20 did not agree with." Robles Depo. 360:18-24; <u>see also</u> PUMF 80. Robles also told Barnum that

21 he had complained to Cervantes about Campo, but Cervantes did nothing. <u>See</u> Robles Depo.

22 362:16-17, 363:16-19; <u>see also</u> PUMF 81. Where exactly Cervantes or Barnum fit within

23 Agreserves's hierarchy is unknown. However, they are both foremen, and they are both above

24 Robles. For purposes of summary judgment, and in the absence of anything to the contrary from

25 Agreserves, the Court will assume that reporting harassing conduct to a foreman is an appropriate

26 method of putting Agreserves on notice of harassment. <u>Cf.</u> <u>Nichols</u>, 256 F.3d at 867 n.10

27 (recognizing that a failure to follow formal reporting requirements was immaterial where the

28 employee complained to a manager and assistant manager).

In terms of what Robles told Barnum and Cervantes, Robles's deposition suggests that he told Cervantes similar things as those he told to Barnum, but there is no express testimony about what Robles actually said to Cervantes.  As for what was said to Barnum, the exact language used by Robles in his deposition would not be sufficient to put Agreserves on notice of any harassment.  The exact language simply indicates that Campo talked about "religious stuff" and Robles disagreed with Campo.  See PUMF 80.  There is nothing in Title VII that prohibits co-workers (or supervisors) from discussing religious matters in the workplace or making religious comments in general, even if others may disapprove or be offended.  See Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 81 (1998).  There is only a problem when the comments are objectively and subjectively offensive and sufficiently severe or pervasive, i.e. when the comments rise to the level of actionable harassment.  See id.  However, in the context of the relevant portion of his deposition, Robles testified that he talked to Barnum "in regards to everything that was happening [at Agreserves]," Robles Depo. 359:22-360:1, and "about the things that were happening," Id. at 360:18-19, that opposing counsel would realize everything that he "told [Barnum] and [Cervantes] in regards to everything that was happening," Id. at 363:16-19, and he told Barnum "About everything that happened, everything completely."  Id. at 366:19-20.  A reasonable reading of Robles's deposition is that he talked to Barnum about all of the problems he was having at Agreserves, including religion harassment by Campo.  Further, a reasonable reading of "Campo talked about religious stuff that [Robles] disagreed with," is that this statement is shorthand for the four offensive religious comments that Campo would make on an almost daily basis.  That is, at his deposition, this was Robles's way of answering that he informed Barnum of the things that Campo would regularly say about religion and non-Mormons.  It may be that Robles did not actually tell Barnum that Campo was making the four offensive comments on an almost daily basis, and that what Robles specifically told Barnum (and Cervantes) was insufficient to place Agreserves on notice.  However, Agreserves does not address this point or submit any evidence about what Robles told either Barnum or Cervantes.  Given that the Court must view the evidence in the light most favorable to Robles and make all reasonable inferences in his favor, see Narayan, 616 F.3d at 899, and given that Agreserves does not address the issue, the Court finds for purposes

of this motion that Robles's complaints about Campo to Barnum and Cervantes put Agreserves on notice of religion harassment.

When Agreserves was on notice of harassment, it had an obligation to act in order to end and deter further harassment.  See Nichols, 256 F.3d at 875-76; Fuller, 47 F.3d at 1528-29. Because Agreserves did not act, it may be liable for Campo's harassment.  See id.  Therefore, summary judgment on this claim is inappropriate.

2.   Discrimination

Payne declares that he was unaware that Robles was Catholic.  See Payne Dec. ¶ 10. Furthermore, there is no evidence that Payne made any religion comments that were similar to those made by Campo.  Robles has presented no evidence that would indicate an anti-Catholic or anti-non-Mormon animus by Payne.

In limited circumstances, "Title VII may still be violated where the ultimate decisionmaker, lacking individual discriminatory intent, takes an adverse employment action in reliance on factors affected by another decisionmaker's discriminatory animus." Galdamaz v. Potter, 415 F.3d 1015, 1026 n.9 (9th Cir. 2005).  Under the "cat's paw" theory, "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and if the act is a proximate cause of the ultimate employment action, then the employer is liable." Staub v. Proctor Hosp., 562 U.S. 411, 422 (2011); see also Poland v. Chertoff, 494 F.3d 1174, 1182 (9th Cir. 2007).  In cat's paw cases, courts regard the biased subordinate's actions as direct evidence of discrimination.  Nichols v. Michigan City Plant Planning Dept., 755 F.3d 594, 600 (7th Cir. 2014).  To establish a "cat's paw" theory, the plaintiff must show that:  (1) a supervisor performs an act motivated by discriminatory animus, (2) that is intended by the supervisor to cause an adverse employment action, and (3) that act is a proximate cause of the ultimate employment action.  Staub, 562 U.S. at 422; Burley v. AMTRAK, 801 F.3d 290, 297 (D.C. Cir. 2015).  "Since a supervisor is an agent of the employer, when he causes an adverse employment action the employer causes it; and when discrimination is a motivating factor in his doing so, it is a motiving fact in the employer's action . . . ." Staub, 562 U.S. at 421; Cook v. IPC Int'l, Corp., 673 F.3d 625, 628 (7th Cir. 2012).  "Proximate cause requires only some direct

48

1  relation between the injury asserted and the injurious conduct alleged, and excludes only those

2  links that are too remote, purely contingent, or indirect." Staub, 562 U.S. at 419; Michigan City,

3  755 F.3d at 604.  If an employer's independent investigation "results in an adverse action for

4  reasons unrelated to the supervisor's original biased action," then the employer will not be liable.

5  Staub, 562 U.S. at 421; Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 351-52 (6th Cir. 2012).

6  However, if the independent investigation "relies on facts provided by the biased supervisor," then

7  the investigation is not actually independent, and the employer is liable.  Staub, 562 U.S. at 421;

8  Chattman, 686 F.3d at 352.  That is, a non-decisionmaker's biased report "may remain a factor if

9  the independent investigation takes it into account without determining that the adverse action

10  was, apart from the supervisor's recommendation, entirely justified." Staub, 562 U.S. at 421;

11  Chattman, 686 F.3d at 351-52.

12      Here, Campo submitted a written statement to Agreserves.  See Guleser Dec. Ex. 19.  The

13  statement described the time in which he supervised Robles.  See id.  In part, Campo explained:

14  (1) Robles was a habitual smoker; (2) Robles asked to leave early on one occasion because he did

15  not get a lunch period earlier in the week; (3) Robles discussed bringing past lawsuits, which made

16  members of Campo's crew nervous; (4) Robles was slow replanting trees; (5) Robles previously

17  worked under Campo and had abandoned that job; (6) he warned Cervantes that Cervantes would

18  have his hands full with Robles; and (7) Robles is a morale killer and makes everyone around him

19  uneasy.  See id.  Campo's statement is clearly critical of Robles.  Furthermore, as discussed above,

20  Campo made four different statements to Robles on numerous occasions that Campo and his

21  religion were superior to Robles and his religion.  See PUMF's 74, 75, 76, 77.  Campo's

22  comments to Robles clearly reflect a bias against Robles because Robles was not Mormon.

23  Considering Campo's comments to Robles and the content of Campo's written statement, it can be

24  reasonably inferred that Campo intended his statement to cause Agreserves to take an adverse

25  action against Robles.  Finally, Payne testified that he could not recall who asked Campo to write

26  the statement, and he could not recall when he first reviewed it.  See Payne Depo. 139:19-24.

27  However, Payne reviewed Campo's statement sometime before the termination.  See id. at 139:25-

28  140:3.  Robles's counsel asked Payne:  "So the question is did you base your decision to terminate

49

Mr. Robles on this statement?  Did you base your decision [to] terminate partially on this statement?"  Id. at 140:4-7.  Payne responded, "Yes."  Id. at 140:8.  The Court takes this answer to mean that Payne partially based the decision to terminate on Campo's statement.  Given the content of Campo's statement, the religion bias reflected in Campo's statements to Robles, and Payne partially basing the decision to terminate Robles on Campo's statement, there is an indication that Payne was Campo's "cat's paw."  See Staub, 562 U.S. at 422.

However, there is a significant issue about whether Campo's written statement was a "proximate cause" of the termination.  First, there is no indication of what facts Payne considered and accepted in Campo's statement, and there is no assertion by Robles that anything that Campo said was false.  Second, Robles does not address Campo's statement or challenge any of the assertions made therein.  Third, and of critical importance, Payne outlined his reasons for terminating Robles in a memo to his supervisor, Eric Miller, and the memo does not include any mention of Campo or the assertions in Campo's written statement.  See Payne Dec. Ex. 3.

Before an employee is terminated at Agreserves, the decisionmaker must secure the agreement of another senior manager.  See Payne Dec. ¶ 10.  In the memo to Miller, Payne explained that on March 14, 2013, Robles had various confrontations with co-workers and supervisors that were very concerning.  Payne Dec. Ex. 3.  Payne then listed several bullet-points: (1) Crew leader Meza asked Robles to keep up with tractors that were laying irrigation hoses, but a short time later, Robles called over Meza and used vulgar angry language about the equipment and situation; (2) Robles told Meza that he was hired to be on the spray crew, and that Agreserves could send Robles home but had better give him unemployment; (3) two co-workers commented that Robles had a bad attitude that day, Robles would not listen to the co-workers' suggestions, and Robles did not stop the tractor when they had problems with the hose; (4) at the end of the day a co-worker suggested to Robles that Robles move the tractor because Robles had parked it incorrectly, but Robles replied aggressively and yelled that he was not going to move the tractor, and began walking away; (5) Meza spoke to Robles as Robles was walking away, and Robles continued to use vulgar language when referring to co-workers; (6) on March 15, 2013, Robles did not come to his assigned place, but went to another location where he complained to Gabriel

50

Arreola[24] in vulgar terms and a raised voice about how bad Salvador Estrada,[25] Meza, and others

were, and he refused to work until his spoke to Payne; (7) on March 29, 2013, Robles spoke to

Payne; (8) Payne could not get Robles to provide a written statement of the accident, Robles

would not answer questions about his own behavior, Robles would not let Payne or Keenan talk

without interrupting, and Robles's voice was raised almost the entire time; (9) when asked to

provide a written statement, Robles said he would not do it, but he wanted to reference his voice

memos and bring a statement back later; (10) when asked why he talked badly using vulgarity and

yelling at Agreserves personnel, Robles blew up, rose from the table, started to leave and said he

was going to the bathroom, and would not respond to questions about his own behavior; (11)

Payne was not able to carry on a civilized conversation with Robles, no matter how calm Payne

remained; (12) when asked whether he was wearing a seatbelt during the accident, Robles

responded that he was wearing one loosely at first, but that he later removed it and was not

wearing it when the accident happened; and (13) later that day, Robles brought Payne a written

statement that claimed he had been wearing a seatbelt, which contradicted Robles's previous story.

See id.  Payne then made the following recommendation to Miller:

> Despite every reasonable effort to have a conversation with [Robles] about his
> inappropriate behavior, I have not received an explanation for the disrespectful,
> out-of-control attitude he has taken since 3/14/13.  He has been insubordinate in
> providing information, wearing his seatbelt, following assignment of his
> supervisors, and over-all belligerent and vulgar in his conduct with crew leaders,
> foremen, management, and human resource managers.  He has willfully
> disregarded safety rules, and then lied about it.  For these reasons, I recommend
> terminating [Robles] effective immediately.

Id.

Payne's memo to Miller is consistent with his deposition testimony and his declaration

submitted in support of this motion.  Payne testified at his deposition that Robles was terminated

for insubordination, acting in a threatening manner to Payne and others, failing to comply with

safety rules, failing to cooperate with the safety investigation, vulgar and offensive language used

towards other Agreserves employees and equipment, and giving untrue statements that conflicted

---

[24] From other parts of the memo, it is possible that Arreola works in the human resources department.

[25] Estrada is a foreman who was working with Meza and Robles on March 14, 2013.  See PUMF 114.

with prior statements during the safety investigation.  See Payne Depo. 21:2-17.  Payne declared that Robles was terminated because he:  was insubordinate to Payne, refused to cooperate by answering questions about disruptive conduct towards other employees and supervisors, refused to answer questions about the accident, was dishonest about wearing a seatbelt, failed to follow supervisors' instructions, and failed to follow safe workplace practices by not wearing a seatbelt.  Payne Dec. ¶ 9.

In no place (be it the memo to Miller, his declaration, or his deposition)[26] does Payne reference Campo or Campo's statement, or reference or rely on anything that Campo wrote in his statement.  Although the memo to Miller lists a number of different names, Campo's name never appears.  See Payne Dec. Ex. 3.  Instead, the focus of Payne's memo is on events that transpired from March 14, 2013 forward.  Insubordination, failure to follow instructions, failure to follow safety protocols, belligerence, and vulgarity are reflected in the March 2013 events recounted in the memo.  The memo's recommendation makes clear that the problem with Robles is "the out of control attitude he has taken *since 3/14/13*."  Id. (emphasis added).  There is no discussion or identification of conduct by Robles that pre-dates March 14, 2013.  By the end of February 2013, Robles was no longer working with Campo.  See DUMF 7; PUMF 12.  Although Payne partially based his decision to terminate Robles on Campo's statement, Payne's memo to Miller (as well as his deposition and declaration) shows that Campo's statement was a *de minimis* consideration.

Given the uncertainty on when Campo's statement was reviewed, Robles's failure to challenge any assertion within Campo's statement, the absence of any indication that facts from Campo's memo were actually relied upon, and the contents of Payne's memo to Miller, the Court concludes that Campo's statement was not a proximate cause of Robles's termination.  See Staub, 562 U.S. at 421; Chattman, 686 F.3d at 351-52.  Rather, the proximate causes of Robles's termination were either the conduct outlined in Payne's memo to Miller or, as discussed above, national origin animus.  Without proximate causation, Robles's cat's paw theory is not viable.  See Burley, 801 F.3d at 297.  Therefore, summary judgment on this claim is appropriate.

---

[26] The Court notes that only a portion of Payne's deposition was provided to the Court.  This is contrary to Local Rules 133(j) and 260, which requires parties to submit a full courtesy copy of any deposition upon which they rely.

1        **3.**    Retaliation

2        Robles has failed to demonstrate a sufficient causal link between protected activity and

3 adverse action.  Robles contends that he complained to Cervantes and Barnum about Campo

4 saying "religious stuff" that he disagreed with.  Consistent with its discussion about religion

5 harassment, the Court will assume that Robles's complaints about Campo talking about "religious

6 stuff" constitutes "protected activity."  See Villiarimo v. Aloha Island Air, 281 F.3d 1054, 1064

7 (9th Cir. 2002) (recognizing internal complaint of sexual harassment as protected activity).  The

8 problem is that the adverse action at issue is the termination.  The termination decision was made

9 by Payne.  There is no evidence that Payne was aware that Robles had made complaints about

10 Campo's religion comments to Barnum and Cervantes.  In fact, Payne declared that he was

11 unaware of any complaints that Robles had made concerning religion harassment at the time of

12 termination.  See Payne Dec. ¶ 10.  If the decision maker has no knowledge of the protected

13 activity, generally there is no causal link.  See Raad, 323 F.3d at 1197; Cohen v. Fred Meyer, Inc.,

14 686 F.2d 793, 796 (9th Cir. 1982); Gunther v. County of Washington, 623 F.2d 1303, 1314 (9th

15 Cir. 1979).  Furthermore, although Campo submitted a negative written statement to Payne in

16 connection with Payne's investigation of Robles, there is no evidence that Campo was aware that

17 Robles had made complaints about Campo's religion comments.  See Rubadeau v. M.A.

18 Mortenson Co., 2013 U.S. Dist. LEXIS 93928, *32 (E.D. Cal. July 2, 2013) (holding that under a

19 "cat's paw" theory of retaliation, the subordinate who influenced the decisionmaker must have

20 knowledge of the protected activity); Kitchen v. WSCO Petroleum Corp., 481 F.Supp.2d 1136,

21 1148 (D. Or. 2007) (same).  Because there is no causal link between any protected activity and

22 adverse action, summary judgment on this claim is appropriate.  See Raad, 323 F.3d at 1197.

23        **C.**    **5th & 6th Causes of Action – Battery and Assault**

24        Robles alleges that Agreserves is vicariously liable for the battery and assault committed

25 by Campo.  That is, the battery committed by Campo against Robles during the "car incident" and

26 the assault committed by Campo against Robles during the "rifle incident."  As discussed above,

27 however, these causes of action against Campo fail due to application of workers' compensation

28 exclusivity, the failure of a necessary element, or both.  When claims against the agent/employee

1  fail, the principal/employer cannot be vicariously liable.  See Lathrop v. Healthcare Partners Med.

2  Grp., 114 Cal.App.4th 1412, 1423 (2004).  Therefore, summary judgment in favor of Agreserves

3  on these claims is appropriate.  See id.

4  **D.      7th Cause of Action – California Labor Code § 226.7 & § 512**

5  *Defendant's Argument*

6      Agreserves argues that its only obligation is to provide a meal break to its employees, it is

7  not required to ensure that the employee takes a meal break.  Agreserves has policies that provide

8  a 20 minute rest period in the morning, a 30 minute lunch period before the end of the fifth hour,

9  and a 10 minute rest period after lunch.  Robles was aware of these policies through orientation,

10  and admitted in his deposition that he received rest periods.  Robles never complained or

11  mentioned that he was not getting meal or rest breaks to either Human Resources or the Farm

12  Production Manager.  On one occasion, Robles voluntarily chose to skip a meal, but there is no

13  requirement that an employer force an employee to take a meal break.  Because there are policies

14  in place that provide for a meal period, there is no violation of law.

15  *Plaintiff's Opposition*

16      Robles argues that summary judgment is not proper.  While he worked under the direction

17  and supervision of Campo and Cervantes, Robles argues that he was not given the opportunity to

18  take a meal break 22 times.  Robles argues that his pay stubs do not reflect one hour of pay for the

19  meal periods he was prevented from taking.

20  *Legal Standards*

21      California law "obligates employers to afford their nonexempt employees meal periods and

22  rest periods during the workday."  Brinker Rest. Corp. v. Superior Ct., 53 Cal.4th 1004, 1018

23  (2012) (citing *inter alia* Cal. Lab. Code §§ 226.7, 512).  An employer meets its obligation to

24  provide a meal break "if it relieves its employees of all duty, relinquishes control over their

25  activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and

26  does not impede or discourage them from doing so."  Id.; Faulkinbury v. Boyd & Assoc's, Inc.,

27  216 Cal.App.4th 220, 229 (2013).  However, "the employer is not obligated to police meal breaks

28  and ensure no work thereafter is performed.  Bona fide relief from duty and the relinquishing of

1  control satisfies the employer's obligations, and work by a relieved employee during a meal break

2  does not thereby place the employer in violation of its obligations and create liability for premium

3  pay . . . ." Brinker Rest., 53 Cal.4th at 1040-41; Faulkinbury, 216 Cal.App.4th at 229.

4       *Discussion*

5       With respect to missed rest periods, Robles does not dispute that he took his 20 minute

6  mid-morning breaks, per California law.  See DUMF 11.  Moreover, Robles's opposition does not

7  address missed rest periods in any way.  Given Robles's deposition and his failure to address any

8  missed rest periods, summary judgment on any claims based on missed rest periods is appropriate.

9  See Ramirez, 560 F.3d at 1026; DUMF 11.

10      With respect to missed meal breaks, the Court is not convinced by Agreserves's

11  arguments.  First, there is more than a single instance of Robles voluntarily missing a meal break.

12  Robles declared that he missed 22 meal periods while working under Campo and Cervantes.  See

13  Robles' Dec. ¶¶ 23, 24. 24.  Second, the existence of a formal policy by Agreserves is unavailing.

14  Robles declared that foremen gave him assignments during the meal periods and prevented him

15  from actually taking a meal period.  See id.  This testimony indicates that foremen and supervisors

16  "impeded" Robles and that Robles was not given "bona fide relief."  If there is impeding behavior

17  or no "bona fide relief," then an employer faces liability.  Brinker Rest., 53 Cal.4th at 1040-41;

18  Faulkinbury, 216 Cal.App.4th at 229.  Summary judgment on this claim is inappropriate.  See id.

19      **E.       8th & 9th Causes of Action – Common Counts -- Work and Labor Performed**
20      **& Quantum Meruit**

21      *Parties' Arguments*

22      Agreserves argues that the Labor Code regulates the payment of wages for time worked by

23  employees, and also sets compensation and penalties for missed meal and rest periods.  Because

24  there is a statute that directly addresses the issues raised by Robles, his two common count claims

25  fail.  Robles does not respond to this argument, or otherwise defend these causes of action.

26      *Discussion*

27      Under the "new right-exclusive remedy" doctrine, "where a statute creates new rights and

28  obligations not previously existing in the common law, the express statutory remedy is deemed to

be the exclusive remedy available for statutory violations, unless it is inadequate." Helm v. Alderwoods Grp., Inc., 696 F.Supp.2d 1057, 1076 (N.D. Cal. 2012); Brewer v. Premier Golf Props., 168 Cal.App.4th 1243, 1252 (2008).  Courts have recognized that regulations that require employers to provide meal breaks and rest breaks create rights that did not exist at common law. See Helm, 696 F.Supp.2d at 1076; Brewer, 168 Cal.App.4th at 1254.  The exclusive remedies for violations of the California meal break and rest break requirements are those found in the California Labor Code.  See Helm, 696 F.Supp.2d at 1076; Brewer, 168 Cal.App.4th at 1254.

Here, Robles's common counts appear to be based on the failure to provide compensation for the meal breaks and rest breaks missed while at Agreserves.  See Complaint at ¶¶ 94, 97.  In the absence of a response or argument by Robles, the Court can only conclude that the "new right-exclusive remedy" doctrine applies to Robles's common counts.  Summary judgment in favor Agreserves on these claims is appropriate.  See Ramirez, 560 F.3d at 1026; Helm, 696 F.Supp.2d at 1076; Brewer, 168 Cal.App.4th at 1254.

### F.    10th Cause of Action – California Labor Code § 226

#### *Defendant's Argument*

Agreserves argues that summary judgment is appropriate on Robles's wage statement claims for several reasons.  First, this cause of action is tied to Robles's meal and rest break claims.  Since those claims fail, so too should the § 226 claim.  Second, a violation of § 226 requires a showing of knowing and intentional conduct by the employer.  The evidence shows that, at the time of termination, Agreserves had a good faith belief that the wage statements provided to Robles were fully compliant.  Third, because the statute of limitations for a § 226 claim is one year, all claims for wage statement violations accruing before February 27, 2013 are time barred.

#### *Plaintiff's Opposition*

Robles argues that he was prevented from taking a meal break for 22 days.  However, Robles's pay stubs do not indicate that he received 1 hour of pay for each of the missed meal breaks.  Because the pay stubs do not reflect the required 1 hour of pay, Robles argues that summary judgment should not be granted.

56

1        *Legal Standards*

2        Labor Code § 226 requires an employer at the time that wages are paid to provide an

3   accurate itemized statement that contains nine items.  See Cal. Labor Code § 226(a); Reinhardt v.

4   Gemini Motor Transp., 869 F. Supp. 2d 1158, 1169 (E.D. Cal. 2012).  Labor Code § 226(e) reads:

5   "An employee suffering  injury as a result of a knowing and intentional failure by an employer to

6   comply with subdivision (a) is entitled to recover the greater of all actual damages or [penalties

7   ranging from $50 to $4,000 depending on the circumstances], and is entitled to an award of costs

8   and reasonable attorney's fees."  Cal. Lab. Code § 226(e)(1); Reinhardt, 869 F.Supp.2d at 1169.

9   In order to recover under Labor Code § 226(e), a plaintiff must show: (1) a violation of § 226(a);

10  (2) the violation was knowing and intentional; and (3) an injury suffered as a result of the

11  violation.  See Novoa v. Charter Communs., Inc., 100 F. Supp. 3d 1013, 1125 (N.D. Cal. 2014);

12  Reinhardt, 869 F. Supp. 2d at 1169.  A violation of § 226 is "knowing and intentional" when the

13  employer actually knows that it has omitted from a pay statement any item required by § 226(a); it

14  is not enough to merely prove a violation of § 226(a).  See Willner v. Manpower Inc., 35

15  F.Supp.3d 1116, 1131 (N.D. Cal. 2014); see also Novoa, 100 F.Supp.3d at 1028.  A plaintiff

16  suffers an injury for purposes of § 226(e) if:  (1) the employer fails to provide a wage statement

17  altogether; or (2) the employer omits an item required by § 226(a) and the employee "cannot

18  promptly and easily determine from the wage statement alone" one of four enumerated categories

19  of information.  See Cal. Lab. Code § 226(e)(1), (2); Derum v. Saks & Co., 95 F.Supp.2d 1221,

20  1229 (S.D. Cal. 2015).  If a plaintiff attempts to obtain the statutory penalties provided by Labor

21  Code § 226(e), then the one year statute of limitations of California Civil Code § 340(a) applies.

22  Novoa, 100 F.Supp.3d at 1024-25; Reinhardt, 869 F.Supp.2d at 1169-70.

23        *Discussion*

24        Initially, contrary to Agreserves's arguments, the Court has found that summary judgment

25  on Robles's missed meal breaks claim is improper.  Therefore, the failure of the meal breaks claim

26  is not a valid basis for summary judgment.

27        With respect to the statute of limitations, Robles does not argue that he seeks actual

28  damages under § 226(e), nor does he respond to Agreserves's argument that any claims accruing

1    before February 27, 2013 are time barred by the one-year limitations period of Civil Code §

2    340(a).  In the absence of an opposition, the Court views Robles as seeking only penalties under §

3    226(e).  Therefore, Agreserves is correct that all claims that accrued before February 27, 2013 are

4    time barred by Civil Code § 340(1), and summary judgment on those claims is appropriate.  See.

5    Summary judgment in favor of Agreserves on all § 226 claims that accrued before February 27,

6    2013 is appropriate.[27]  Ramirez, 560 F.3d at 1026.

7         With respect to claims that accrued after February 26, 2013, Agreserves has submitted the

8    declaration of Walter Keenan, who is its Human Resources Director.  In pertinent part, Keenan

9    declared:  "Agreserves has a policy of paying all wages due at time of termination.  At the time of

10   [Robles's] termination, I believe that [Robles] was provided the full amount of wages for hours he

11   worked at Agreserves, and I have a good faith belief that all wage statements Agreserves provided

12   to him were compliant and accurate."  Keenan Dec. ¶ 10.  Agreserves relies on this declaration to

13   argue that it had a good faith belief that its wage statements were compliant with the law.  See

14   DUMF 50.  Robles disputes DUMF 50 and Keenan's declaration by pointing out that:  (1)

15   Robles's foremen caused him to miss 22 meal breaks, (2) none of Robles's paychecks reflect an

16   hour's wage for any of the 22 missed meal breaks, (3) another worker testified he was told to work

17   through a meal break to finish a job if the job was urgent, and (4) Payne considered a statement by

18   Campo that included Robles complaining to Campo that "Epifanio" prevented Robles from taking

19   a meal break.  See Plaintiff's Response to DUMF 50.

20        The Court cannot conclude that Robles has not adequately refuted DUMF 50 or otherwise

21   shown that Agreserves's violation of § 226(a) was "knowing and intentional."  First, the Court

22   will assume that the absence of pay for any of the 22 missed meal periods demonstrates a violation

23   of §§ 226(a)(1), (5), and/or (9).  However, simply demonstrating a violation of § 226(a) does not

24   show "knowing and intentional" conduct.  See Willner, 35 Supp.3d at 1131.  Second, Ramon

25   Lopez (a general labor employee of Agreserves) testified that, if a job is urgent, Agreserves

26

27   _____

[27] Robles worked under Campo from February 4 to February 25, 2013.  See DUMF 7; see also Campo Dec. ¶ 3;
Guleser Dec. Ex. 19.  Each of these dates fall outside of § 340(a)'s one-year limitations period.  Depending on when
28   Robles was given his pay stubs/wage statements, it is possible that a significant portion of Robles's § 226 claims may
be time barred.

instructed him to continue working until the job is finished, and then the break is taken.  See Lopez Depo. 7:9:8:1.  Lopez also testified that Agreserves tries mostly to get the break before five hours, but depending on the situation, the break could occur after five hours.  See id.  This testimony shows that Agreserves sometimes requests that an employee continue working until an urgent job is done, and then take a meal break.  It does not discuss payment for the missed meal break, or whether any information or compensation concerning the missed meal break is included on pay stubs/wage statements.  Without testimony from Lopez that compensation for the missed meal period was included in the pay check/wage statement, there is nothing to indicate a violation of § 226(a).  Finally, Payne did review a document from Campo that included Robles telling Campo about Epifanio causing him to miss a meal period.  See Payne Depo. 139:12-140:8; Guleser Dec. Ex. 19.  However, there is no evidence that Payne reviewed any of Robles's pay check/wage statement information, or knew that Robles had not been compensated for the incident involving Epifanio or any other missed meal breaks.  There is also no evidence that Payne relayed this information to Human Resources or appropriate personnel in the payroll department.

In short, Robles his demonstrated that employees sometimes are told to miss their meal periods and the he personally was not compensated.  Robles has not shown that Agreserves knowingly and intentionally violated § 226(a).  Summary judgment in favor of Agreserves on this claim is appropriate.  See Willner, 35 F.Supp.3d at 1131.

### G.    11th Cause of Action – Labor Code § 558

*Defendant's Argument*

Agreserves argues that because this claim is derivative of the meal and break period claim. Because meal and break period claim fails, the Labor Code § 558 claim also fails.

*Plaintiff's Opposition*

Robles argues that summary judgment is improper.  Labor Code § 558 provides penalties for violations of other Labor Code provisions.  Because his meal break claims are viable, Robles argues that he should recover the penalties under § 558.

*Discussion*

Agreserves's argument is based entirely on the viability of Robles's claim for missed meal

1  breaks.  Because the Court has found that summary judgment is improper on Robles's missed

2  meal breaks claim, Agreserves's express argument is unavailing.

3      Nevertheless, as discussed above, there is no private cause of action created by Labor Code

4  § 558.  See Renazco, 2014 U.S. Dist. LEXIS 168922 at *7; Morales, 2014 U.S. Dist. LEXIS

5  150114 at *24; Chand, 2014 U.S. Dist. LEXIS 22985 at *30; Ruiz, 2003 U.S. Dist. LEXIS 27872

6  at *4-*7.  The penalties of Labor Code § 558 can be recovered by an individual employee by

7  utilizing the procedures in Labor Code § 2699.3.  See Sarmiento v. Wells Fargo, 2015 U.S. Dist.

8  LEXIS 51159, *6-*7 (C.D. Cal. Apr. 17, 2015); Chang v. Biosuccess Biotech Co., Ltd., 76

9  F.Supp.3d 1022, 1049-50 (C.D. Cal. 2014); Cal. Lab. Code §§ 2699(a), 2699.3; Reynolds v.

10  Bement, 36 Cal.4th 1075, 1089 (2005).  Because Robles's claims are not brought pursuant to

11  Labor Code § 2699, he cannot recover the penalties of § 558.  Therefore, summary judgment on

12  this claim is appropriate.

13      **H.**      **12th Cause of Action – California Business & Professions Code § 17200**

14      *Parties' Arguments*

15      Agreserves argues that this claim is derivative of Robles's other causes of action, and

16  because those claims fails, this claim fails as well.  Robles does not respond to this argument.

17      *Discussion*

18      California Business & Professions Code sec 17200 prohibits "unfair competition," which

19  is defined to mean any "unlawful, unfair, or fraudulent business act or practice."  Cal. Bus. & Prof.

20  Code § 17200; In re Tobacco II Cases, 46 Cal.4th 298, 311 (2009).  For claims based on

21  "unlawful" conduct, the UCL "borrows violations of other laws and treats these violations, when

22  committed pursuant to business activity, as unlawful practices independently actionable . . . and

23  subject to the distinct remedies provided thereunder."  Farmers Ins. Exch. v. Superior Court, 2

24  Cal.4th 377, 383 (1992).

25      Here, the Complaint shows that this cause of action is based on Agreserves failing to

26  provide Robles with meal and rest breaks.  See Complaint at ¶ 113.  As discussed above, Robles

27  has viable meal breaks claims, but not rest break claims.  Because Robles has viable meal break

28  claims, he has a viable § 17200 claim.  Summary judgment on this claim is inappropriate.

## I.        13th Cause of Action – California Labor Code § 1102.5

### Defendant's Argument

Agreserves argues that Robles cannot establish a prima facie case of "whistleblower" retaliation.  Robles bases his § 1102.5 claims on complaints about wage and hour violations and unsafe working conditions.  However, these claims were brought to Payne's attention via a written statement on April 1, 2013 – after his employment was terminated.  Moreover, Robles cannot show a causal connection between any protected activity and his termination, and there is no evidence that Payne's reasons for terminating Robles was pretext.

### Plaintiff's Opposition

Robles argues that his knee was injured on March 14, 2013, while he was driving a tractor with a faulty seat over uneven ground.  Robles argues that he complained that his foreman instructed him to drive faster, which caused him to hit his knees on the steering wheel.  Robles had also complained about race and national origin harassment.  Payne allegedly terminated Robles for not participating in the investigation regarding Robles's injured knee and using vulgar language.  However, Robles argues that he explained why he was injured and what had happened, and that foremen often used vulgar language.  Payne was obviously looking to find some reason to justify Robles's termination following Robles's complaints about unsafe work conditions and various kinds of harassment.

### Legal Standards

Labor Code § 1102.5 is a "whistleblower" statute.  See Rope v. Auto-Chlor System of Washington, Inc., 220 Cal.App.4th 635, 648 (2013).  Labor Code § 1102.5 was amended in 2014.  In 2013, § 1102.5(b) prohibited an employer from retaliating against an employee who reveals a violation of state or federal law or regulation to a governmental agency.  See Soukup v. Law Offices of Herbert Hafif, 39 Cal.4th 260, 287 (2006); Rope, 220 Cal.App.4th at 648.  In 2013, § 1102.5(c) protected an employee from retaliation by an employer for refusing to participate in conduct that would violate a statute or regulation.  See Rope, 220 Cal.App.4th at 648.  To establish a prima facie case of retaliation under § 1102.5, "a plaintiff must show that she engaged in protected activity, that she was thereafter subjected to adverse employment action by  her

employer, and there was a causal link between the two." Soukup, 39 Cal.4th at 287-88; McVeigh v. Recology San Francisco, 213 Cal.App.4th 443, 468 (2013).

*Discussion*

Robles's Complaint alleges claims under § 1102.5(b) and § 1102.5(c).  See Complaint at ¶¶ 117, 118.

With respect to § 1102.5(b), Robles contends that he was retaliated against for complaining about harassment and unsafe working conditions.  See id. at ¶ 117.  Robles's opposition indicates that the complaints he made were to Agreserves personnel.  See Doc. No. 36 at pp. 20-21. Under the 2013 version of § 1102.5, only complaints or reports made to a governmental agency are protected; complaints or reports made "internally" to the employer are not protected.  See Green v. Ralee Engineering Co., 19 Cal.4th 66, 77 (1998); Rope, 220 Cal.App.4th at 648-49; McVeigh, 213 Cal.App.4th at 469.  Because Robles did not report his suspicions to a governmental agency, he did not engage in protected activity for purposes of § 1102.5(b).[28]  See id.  Summary judgment on Robles's § 1102.5(b) claim is appropriate.  See id.

With respect to § 1102.5(c), the evidence does not reflect a refusal to engage in unlawful conduct.  Instead, the evidence shows that Robles complained about Campo's conduct and workplace conditions to Cervantes, Barnum, or Payne, but Robles still performed his work, including riding on the tractor until his knee was injured.  Complaining about various conditions is "reporting activity," it is not a refusal to act.  See Tobin v. City & Cnty of San Francisco Police Dept., 2015 U.S. Dist. LEXIS 54917, *14-*15 (N.D. Cal. Apr. 24, 2015) (and numerous cases cited therein).  There is simply no evidence that Robles refused to perform an activity because he believed it would violate a state or federal rule or regulation.  Without a refusal to engage in "unlawful conduct," Robles did not engage in protected activity under § 1102.5(c).  See Tobin, 2015 U.S. Dist. LEXIS 54917 at *14-*16; Mayo v. Recycle to Conserve, Inc., 795 F.Supp.2d 1031, 1047 (E.D. Cal. 2011); Rope, 220 Cal.App.4th at 648-49.  Summary judgment on Robles's § 1102.5(c) claim is appropriate.

---

[28] Robles declares that he filed a complaint with OSHA against Agreserves.  See Robles Dec. ¶ 24.  However, the submitted evidence shows that the complaint was filed in early April 2013, after his termination.  See Robles Dec. Ex. 25.  Because the termination predates the OSHA complaint, the termination could not have been retaliatory.

1   **J.     14th Cause of Action – Wrongful Termination in Violation of Public Policy**

2   *Defendant's Argument*

3       Agreserves argues that summary judgment should be granted because no evidence

4   indicates that the termination violated public policy or that the termination was motivated by a

5   violation of public policy.  Payne presented legitimate, non-retaliatory business reasons for

6   terminating Robles.  To wit, Robles was insubordinate, refused to cooperate with an investigation,

7   was dishonest, and did not follow safety procedures.  Robles cannot proffer any evidence that

8   some unlawful retaliatory motive was what substantially motived the termination.

9   *Plaintiff's Opposition*

10      Robles argues that he has presented evidence that Agreserves's reason for termination was

11  pretext and that the real reason for termination was because of his public policy complaints and his

12  protected status.  Robles argues he has viable claims for race and national origin discrimination, as

13  well as retaliation under Labor Code § 1102.5.  The California policies against retaliation and

14  discrimination that Agreserves violated when it terminated Robles are policies that support a

15  wrongful termination claim.  Therefore, summary judgment should be denied.

16  *Legal Standards*

17      The elements of a claim of wrongful termination in violation of public policy are:  (1) the

18  plaintiff was employed by the defendant, (2) the defendant discharged the plaintiff, (3) a violation

19  of public policy was a motivating reason for the discharge, and (4) the discharge harmed the

20  plaintiff.  Nosal-Tabor v. Sharp Chula Vista Medical Center, 239 Cal.App.4th 1224, 1234-35

21  (2015); Diego v. Pilgrim United Church of Christ, 231 Cal.App.4th 913, 920 (2014).  To be

22  actionable, the discharge must violate a policy that is: (1) delineated in either constitutional or

23  statutory provisions; (2) "public" in the sense that it "inures to the benefit of the public" rather

24  than serving merely the interests of the individual; (3) well established at the time of the discharge;

25  and (4) "substantial" and "fundamental."  Stevenson v. Superior Ct., 16 Cal.4th 880, 901–02

26  (1997); Diego, 231 Cal.App.4th at 1235.

27  *Discussion*

28      To the extent that Robles is relying on his retaliation causes of action, such reliance is

63

1   unavailing.  As discussed above, Robles has no viable claims for retaliation.  With respect to

2   Labor Code § 1102.5, Robles did not engage in "protected activity."  With respect to Title VII

3   retaliation,[29] there is no legitimate evidence that Robles complained about Campo's comments

4   about national origin, and there is no evidence that either Campo or Payne were aware that Robles

5   complained about Campo's religion comments.  Therefore, Robles's termination does not

6   implicate any public policy against retaliation.

7          With respect to discrimination, California has an important fundamental public policy

8   against discriminatory terminations, as reflected in FEHA.  See Brown v. Superior Ct., 37 Cal.3d

9   477, 485 (1984); Prue v. Brady Co./Sand Diego, Inc., 242 Cal.App.4th 1367, 1383 (2015);

10  Northrop Grumman Corp. v. Workers' Comp. Appeals Bd., 103 Cal.App.4th 1021, 1035 (2002).

11  Contrary to Agreserves's arguments, there is sufficient evidence that Robles's termination was

12  because of his national origin.  Payne used offensive and bigoted terms with respect to Robles's

13  national origin when referring to Robles.  Payne's statements are sufficient to indicate that

14  Robles's national origin was a motivating reason for the termination, i.e. a violation of public

15  policy.  See Brown, 37 Cal.3d at 485; Prue, 242 Cal.App.4th at 1383; Diego, 231 Cal.App.4th at

16  920.  Summary judgment on this cause of action is improper.  See id.

17          **K.      15th Cause of Action – False Imprisonment**

18          Robles contends that Agreserves is vicariously liable for the false imprisonment committed

19  by Campo during the "car incident," and by Payne during the termination meeting.  With respect

20  to Campo, as discussed above, the Court has granted summary judgment in favor of Campo for

21  false imprisonment.  Therefore, summary judgment in favor of Agreserves is appropriate.  See

22  Lathrop, 114 Cal.App.4th at 1423.

23          With respect to Payne, as discussed above, the Court has denied summary judgment in

24  favor of Payne for false imprisonment.  Therefore, summary judgment in favor of Agreserves must

25  also be denied.  See Lisa M. v. Henry Mayo Newhall Mem. Hosp., 12 Cal.4th 291, 296 (1995)

26  (holding that under a *respondeat superior* theory, an employer is held vicariously liable for the

27  torts committed by its employee within the course and scope of employment).

28  ───────────────────
[29] The Complaint contains two Title VII retaliation claims, but no FEHA retaliation claims.  See Doc. No. 1-1.

**L.    16th Cause of Action –IIED**

*Defendant's Argument*

Agreserves argues that Robles's IIED cause of action is based on seven claims:  (1) national origin harassment; (2) religion harassment; (3) retaliatory termination for complaining about harassment and unsafe working conditions; (4) discriminatory termination; (5) false imprisonment; (6) assault by Campo; and (7) prohibiting Robles from having meal breaks.  To the extent that the any of these underlying claims fail, so too fails the IIED claim.

If any of the underlying claims survive, summary judgment is still warranted because Robles cannot meet the elements of IIED.  First, none of the acts complained of are sufficiently outrageous.  Second, there is no credible evidence that Robles suffered "severe emotional distress."  Third, no one at Agreserves intended to cause Robles emotional distress.

Additionally, Agreserves argues that workers' compensation bars this IIED claim because each of the relevant acts is a normal part of the employment relationship.

*Plaintiff's Opposition*

Robles argues that the false imprisonment by Payne and the false imprisonment, assault, battery, and harassment by Campo were "outrageous," and that Agreserves is vicariously liable for those acts.  Robles also argues that he has provided sufficient evidence of severe emotional distress based on the fear, depression, anxiety, nightmares, etc. that he experienced.

*Discussion*

The Court has largely dealt with these arguments in resolving Campo's and Payne's respective summary judgment motions, or in resolving other portions of Agreserves's motion. Initially, as discussed above, Robles has submitted sufficient evidence that he experienced "severe emotional distress."  See PUMF's 162-168.

With respect to assault by Campo, the Court has found that there is no viable cause of action.  Therefore, the alleged assault by Campo is not a basis for IIED, and summary judgment on this claim is appropriate.

With respect to battery by Campo, the Court has found that there is no viable cause of action.  Therefore, the alleged battery by Campo is not a basis for IIED.  Alternatively, the alleged

1    battery (being struck in the hand two to three times while Campo hit the truck seat) is not close to

2    being sufficiently outrageous to support an IIED claim.  See Hughes, 46 Cal.4th at 1050; Potter, 6

3    Cal.4th at 1001.  Summary judgment on this claim is appropriate.

4           With respect to FEHA national origin harassment by Campo, the Court has found that

5    there is no viable cause of action.  Therefore, the alleged national origin harassment by Campo is

6    not a basis for IIED, and summary judgment on this claim is appropriate.

7           With respect to false imprisonment by Campo, the Court has found that there is no viable

8    cause of action, and that Campo's conduct is not sufficiently outrageous to support an IIED claim.

9    Therefore, the alleged false imprisonment by Campo is not a basis for IIED, and summary

10   judgment on this claim is appropriate.

11          With respect to false imprisonment by Payne, although there is a viable cause of action, the

12   Court has found that Payne's conduct is not sufficiently outrageous.  Therefore, the alleged false

13   imprisonment by Payne is not a basis for IIED, and summary judgment on this claim is

14   appropriate.

15          With respect to retaliation for reporting harassment and unsafe working conditions, the

16   Court has found no viable causes of action.  Therefore, the alleged retaliation by Agreserves is not

17   a basis for IIED, and summary judgment is appropriate.

18          With respect termination based on religion animus, the Court has found that there is no

19   viable cause of action.  Therefore, the alleged religion discrimination by Agreserves is not a basis

20   for IIED, and summary judgment is appropriate.

21          With respect to meal breaks, Robles does not defend this basis for an IIED claim.

22   Therefore, summary judgment for this reason is appropriate.  See Ramirez, 560 F.3d at 1026.

23          To the extent that Robles relies on battery by Payne, the Court has found that there is no

24   viable cause of action.  Therefore, the alleged battery by Payne is not a basis for IIED.

25   Alternatively, the alleged battery (pushing Robles once during the termination meeting) is not

26   close to being sufficiently outrageous to support an IIED claim.  See Hughes, 46 Cal.4th at 1050;

27   Potter, 6 Cal.4th at 1001.  Summary judgment on this claim is appropriate.

28          Finally, with respect to religion harassment and discharge based on national origin

66

discrimination, the Court has found that Robles has viable claims.  California courts recognize that FEHA discrimination and harassment constitute "outrageous" conduct.  See Murray, 79 Cal.App.4th at 1362-63.  Furthermore, FEHA discrimination and harassment are not covered by workers' compensation exclusivity.  See Nazir, 178 Cal.App.4th at 286; Murray, 79 Cal.App.4th at 1363; Accardi, 17 Cal.App.4th at 352.  The nature of the harassment, and the words used by Payne, are sufficient to create a genuine dispute regarding intent.  Therefore, the religion harassment and national origin discrimination experienced by Robles may serve as the basis for an IIED claim.  Summary judgment on this claim is inappropriate.

## **ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. With respect to Payne's motion, summary judgment is GRANTED as to Robles's causes of action for:

   a.   Assault; and

   b.  Battery;

2 With respect to Payne's motion, summary judgment is DENIED as to Robles's cause of action for false imprisonment;

3 With respect to Campo's motion, summary judgment is GRANTED as to Robles's causes of action for:

   a.    Title VII;

   b.    The California Constitution;

   c.    FEHA national origin harassment;

   d.    Assault;

   e.    Battery;

   f.    False imprisonment;

   g.    Labor Code § 558; and

   h.    Intentional infliction of emotional distress based on assault, battery, false imprisonment, and national origin harassment;

4      With respect to Campo's motion, summary judgment is DENIED as to Robles's causes of

action for:

    a.      FEHA religion harassment; and

    b.      Intentional infliction of emotional distress based on religion harassment;

5.      With respect to Agreserves's motion, summary judgment is GRANTED as to Robles's

causes of action for:

    a.      Title VII harassment and retaliation based on national origin;

    b.      Title VII discrimination and retaliation based on religion;

    c.      Assault;

    d.      Battery;

    e.      Labor Code § 226;

    g.      Labor Code § 558;

    h.      Labor Code § 1102.5;

    i.      False imprisonment based on conduct by Campo;

    h.      wrongful termination violation of public policy based on violation of Labor Code

        § 1102.5;

    i.      Common counts for work performed and quantum meruit; and

    j.      IIED based on assault, battery, missed meal breaks, retaliation, national origin

        harassment, religion discrimination, and false imprisonment;

6.      With respect to Agreserves's motion, summary judgment is DENIED as to Robles's causes

of action for:

    a.      Title VII discrimination based on national origin;

    b.      Title VII harassment based on religion;

    c.      Labor Code § 226.7 & § 512;

    d.      Business & Professions Code § 17200;

    e.      False imprisonment based on conduct by Payne;

    f.      Wrongful discharge in violation of the policy reflected in FEHA; and

    g.      IIED based on religion harassment and discriminatory discharge; and

7.   The Clerk shall CORRECT the docket to reflect that that "George Campo," and not "Jorge

Campos," is the proper defendant.

IT IS SO ORDERED.

Dated:   January 27, 2016   

_____

SENIOR  DISTRICT  JUDGE